# RANDALL L. GREEN, Ph.D.
## Clinical Psychologist

2250 D Street NE
Salem, Oregon 97301
(503) 364-6093          Fax: (503) 364-5121          **Licensed in Oregon and Washington**

CORRECTED COPY
**FORENSIC PSYCHOLOGICAL EXAMINATION**

| | |
|---|---|
| **CASE NAME:** | **Sweet Sugar Series** |
| **EXAMINEE:** | **Sweet White Sugar - Pia (Pseudonym)** |
| **DATE OF BIRTH:** | **Mid-teens** |
| **DATE OF EXAMINATION:** | **July 28, 2019** |
| **DATE OF REPORT:** | **February 26, 2020** |

## NOTE REGARDING PRESERVATION OF VICTIM/SURVIVOR PRIVACY

*The nature of internet exploitation of images of child sexual abuse has led to a new standard of practice to identify victims/survivors of this type of crime by a pseudonym chosen by the survivor or, in the case of a minor, the legal guardian. Additionally, any identifying place names and other traceable personal information that might lead to the identification of the victim/survivor have been sanitized or redacted to maximize the continued anonymity of the victim/survivor for her or his protection.*

*This need for protecting victim/survivor anonymity with internet-based crimes of sexual exploitation is based on information provided by the National Center of Missing and Exploited Children (NCMEC), The Canadian Centre for Child Protection, national law enforcement agencies and international law enforcement agencies. Evidence is clear that there continues to be ongoing criminal activity involving images of children's sexual exploitation that can include any particular survivor's images. Pia and the others in the series known as Sweet Sugar are no exception.*

*Further, there exists with this type of criminal activity a known risk that those involved in any capacity with such exploitation images may be actively seeking personal information, identification and/or location of victims/survivors. In some cases, persons have attempted to make contact with victims upon whose images they may be fixated. Hence, the imperative need to make all possible efforts to protect the identity of persons who still may be known targets of further criminal efforts.*

*Finally, the reader of this report is cautioned in advance that the content regarding descriptions of some of the images, as provided by authorities, is sometimes explicit and certainly objectionable.*

## SWEET SUGAR SERIES SUMMARY

The sentencing order of the father, who was perpetrator of the abuse of Ava, her sisters and at least four other female children, indicates that he produced and distributed onto the internet a total of 482 images and 88 videos.

Within the Sweet Sugar series, there are images that include a very young girl lying on her back with her legs over her head. Two videos depict a young girl approximately 5-6 years old in which her abuser is inserting a "long white plastic dildo in her rectum." Another video depicts a younger version of the same girl lying naked, legs over her head, wherein the abuser is licking her while the child was prompted to say, "Asshole" and "Vagina."

A federal agency summary of the international Sweet Sugar Investigation dated April 25, 2018,

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 2

provides an overview of the investigatory findings:  "There are hundreds of images currently in the [redacted] Database that are known to have been circulated and continue to be shared and collected.

1. [Ava] and [Mya] have several images involving them posed naked in provocative positions or exposing their genitalia either alone or with their youngest sister Pia who was the primary victim based on the recovered evidence.

2. In addition, [their father] video recorded many sexual abuse interactions with his youngest daughter (Pia) using items such as a vibrator and pens to vaginally/anally penetrate herself, [her father] performing cunnilngus on her,  [Pia] performing fellatio on her father and [her father] having anal intercourse with [Pia]."

The sentencing order further specifies that their father had sexual intercourse with her sister Pia, most likely beginning in March 2009 and continuing doing so for nearly two years when he was arrested. Their father admitted to grooming Pia when she was four years old by showing her videos containing sexually abused children so he could mold her to perform acts he initiated with her without protest. Reports summarize, "The video and pictorial material demonstrates that his grooming was very successful."

Official records indicate that Pia, in particular, was "preyed upon sexually by [their father] in virtually every way imaginable… with a calm and controlled manner, using a voice that is never raised, is at times descriptive and clinical, that invites the child to reveal herself physically in the most intimate ways for his camera, and to which she readily responds… she is completely trusting of her father when he asks to do or perform any act, or expose herself in any way. He also caused her to engage in a fetish of his own, as well as one scripted by an online 'friend.' One lengthy video reflects him prompting Pia to say phrases that online "associates" had requested of him to have Pia vocalize while being sexually exploited and abused."

He orchestrated recurrent themes, memorialized into images and videos and distributed onto the internet include crimes that involved touching his mouth, fingers and objects on Pia's genitalia. He caused Pia to touch his penis and masturbate him to ejaculation on multiple occasions. The sentencing order says he did this for his own pleasure and the pleasure of those who viewed the images on the internet.

The sentencing order quotes an email in which their father wrote about lessons learned through the abuse and recording of his seven identified victims, "There's being careful and there's taking calculated risks. If we're too careful we get nothing. Pushing that boundary line as far as possible seems like the way to go. Far enough to gauge their reaction and react appropriately, but never so far that you can't talk your way out of it if needed."

The [federal agency] Unit currently receives daily requests from US Law Enforcement and US Attorney's Office to confirm the identity of the victims…"

## REASON FOR REFERRAL

Deborah Bianco, attorney at law, has requested an updated evaluation on her client Pia (pseudonym) since her previous forensic evaluation was conducted in early 2017. At that time, the evaluator wrote, "Pia was five at the time of [her father's] arrest and her mother believes that she was "three or four" when it began.

At the present time, Ms. Bianco represents that more than 500 perpetrators have been charged with crimes related to possession of one or more images in the Sweet Sugar series. Ms. Bianco has retained this examiner to provide an updated forensic assessment on how Pia is now doing with

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 3

regard to her psychosocial injuries related to her knowledge of the internet activities involving their images.

## PROCEDURES USED

(**NOTE**:  This database that includes psychological testing, collateral contacts with her mother and sisters, and available records will provide the substance for the findings, summary and opinions contained in this report. Quotations are accurate, but not necessarily verbatim, representations of the communications provided by persons interviewed during this evaluation.

Prior to commencing this forensic psychological examination, I oriented Pia's mother and legal guardian about the nature of this evaluation and the purposes for which it is being conducted. She then read and signed the Forensic Psychological Assessment, Disclosure Statement for Legal Guardian after being given the opportunity to ask any questions she might have regarding its contents.)

The following procedures were used in conducting this evaluation:
Diagnostic interview with Pia on July 28, 2019: 3.0 hours and
July 30, 2019: 2.5 hours
Collateral interview with Pia's mother: July 28, 2019: 3.75 hours and
Telephone interview with her mother on January 25, 2020: 2.25 hours
Collateral interview with Pia's sister, Ava: July 29, 2019: 2.75 hours
Collateral interview with Pia's sister, Mya: July 29,2019: 2.25 hours

Review of records, including the following:
Elementary school records: 90 pp.
Email re image description dated October 24, 2018: 1 pg.
Email re mother's testimony, dated May 25, 2019:  1 pg.
Email re description of videos by an AUSA re evidence obtained in a
specific case, dated October 25, 2018: 1 pg.
Forensic evaluation dated January 7, 2017: 5 pp.
Forensic evaluation - interim, dated October 17, 2016: 4 pp.
Images – non-explicit [sanitized or redacted]
Mental health records: 196 pp.
Mental health treatment summary from 2010 – 2013: 1 pp.
NCMEC Attorney Series Information Report:  4 pp.
Victim impact statement from mother re children - 2016: 5 pp.
Victim impact statement from mother re children– 2019: 4 pp.
Law enforcement agency case summary: 4 pp.
Law enforcement agency investigation records: 107 pp.
Sentencing order of [perpetrator/birthfather]: 7 pp.
Email re description of videos by an AUSA re evidence obtained in a
specific case, dated October 25, 2018: 1 pg.
Teleconference with therapist presently seeing Pia; February 13, 2020: 1.0 hours

Psychometric testing and/or questionnaires, including the following:
Beck Depression Inventory-II
Behavior Assessment System for Children – Parent Rating Scale
Behavior Assessment System for Children – Self-Report
Generalized Anxiety Disorder-7 (GAD-7)
Millon Adolescent Clinical Inventory (MACI)
Patient Health Questionnaire – 9 (PHQ-9)

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 4

PTSD Checklist for DSM-5 (PCL-5)
Psychological Evaluation Questionnaire (re internet images)

I have administered the above battery of tests, reviewed documents provided to me and have spoken to her *collateral* sources of information who were informed of the confidential nature of the discussion. When considering the interviews, psychometric testing, collateral records and collateral interview, I have attempted to generate legally relevant hypotheses and to provide helpful information to the court. Most of all, I have viewed my role in this matter as expert to the court, attempting to assist the Court in matters related to victim restitution.

## INTERVIEW BEHAVIOR AND OBSERVATIONS

Pia was interviewed on two separate dates, July 28 and July 30, 2019, for a total of 5.5 hours. She was casually dressed and a quiet spoken, reticent participant in the diagnostic interview. She appeared her stated age. Pia was introverted and generally gave poor eye contact. Clearly it was an effort for her to be interviewed, wherein she was being asked to address her life experiences and current state.

Notwithstanding Pia's apprehension about the interview, she was cooperative with the interview and that, for her, was difficult. Overall, her affect was blunted and consistent with someone who presented as serious and weighed down with concerns. She was somewhat dull, flat, lackluster and listless during the interview. Of note, she shared during the interview that she was not nearly as depressed as she had been approximately 2-3 months earlier.

There was no indication of agitation, hyperactivity, restlessness or fidgety behavior. Pia was withdrawn and passive in her interaction in the interview. Her receptive and expressive language functions were intact. She spoke softly and there were often delays in her responses. There typically were several seconds between questions posed to her and her responses.

Pia's facial expressions were generally sad. Her mood appeared to be depressed and anxious. Her affect was flat and constricted. She was oriented with regard to time, person, place and situation. Her memory appears to be intact for meaningful events.

Her ability to abstract is intact and is developmentally consistent with others in her age group. She is generally uncertain and indecisive. Pia's insight into the nature of her challenges is hampered by her emotional state of depression and coping mechanism of avoidance. She does recognize she has problems and continues to be amenable to treatment.

Intellectually she appears to be functioning in the average range. Her thought processes are tentative, but able to be followed and understood. Pia has entertained thoughts of suicide in the past. More broadly, she appears to feel overwhelmed by life, burdened by her struggles in multiple domains; Pia appears to be weary and fatigued. She is attracted by thoughts of non-existence as a respite from her condition. Acknowledging she had been feeling more suicidal a few months ago, she says she is less so now, adding she has no plans and would never attempt to take her life. (It should be noted that the pressure of functioning at school had been removed, and may account for her feeling less overwhelmed than a few months earlier.)

At the outset of the second interview, Pia was asked about how it was for her following the first interview. She said that talking about the issues led to her having a headache and "stirring up worries and painful subjects for her. Even so, she glazed over details of its impact on her, minimizing and being vague about how talking about these issues affected her. She concluded by saying, "I don't know."

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 5

## PSYCHOSOCIAL HISTORY
### Developmental history
Pia's family background does not include any known history of diagnosed mental disorders. Her mother expresses the belief that Pia's paternal grandmother abuses alcohol. Her prenatal, birth, neonatal development and achieving developmental milestones were all without difficulty and within normal limits according to her mother.

### Family of origin
Pia was welcomed into a two-parent household that her mother has described as "normal-appearing" at the time. Pia was wanted and welcomed warmly into the family. Her birthmother says she has been a devoted parent who, from having herself been a single child, had dreamt of being a mother and having a family of her own someday.

Her mother was a stay-at-home mother for Pia's older three siblings. Her birthfather was the primary wage earner in the family.

Pia's family of origin now includes her mother and older three siblings, although it originally also included her birthfather for the first five years of Pia's life. Her brother is now a young adult who is in his early twenties. Her oldest sister, Ava is approximately 20 years old. Mya, the third oldest child, is now in her late teens. Pia is the youngest child of the four and now in her mid-teens.

Her mother remembers the early years of their family's story in very positive ways. To be sure, she said they were busy years with three children older than Pia by four, five and six years. She says that her oldest two siblings were beginning to play ice hockey, resulting in the all-too-familiar "parent taxi service" – with one car available. Her mother describes positive memories of the family going winter tobogganing and camping on weekends during the summer.

Her mother describes Pia as vibrant and socially outgoing as a young child – describing her as "a social butterfly." She remembers that Pia's older siblings were actively involved with friends in the neighborhood, schoolmates, sports teammates and church activities.

Looking back, she says, "There was no indication that things were not all as they appeared. It all appeared to be healthy and 'good busy.' She and the children were actively involved at their local church. Their father had also been involved in church until the time when Pia was about three years old, when he began pulling away, leaving her and the children to attend.

Financial necessities of their young and active family of six led to a decision by their mother that she had to take on a second job to cover expenses. She and their father arranged to minimize childcare costs for Pia by working approximately opposite shifts to maximize parental coverage. With some exceptions from time to time, the older children were at school during the daytime.

Significantly younger than the next oldest sibling by four years, Pia has reported that her siblings treated her like the baby in the family.

### Medical history: early childhood
Pia has no history of head injury, major high fevers or significant or chronic illnesses beyond normal childhood diseases.

### Mental health treatment history prior to sexual abuse disclosures
None

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 6

## Implosion of family's world

In January 2010, when Pia was approximately 5-1/2 years old, authorities learned that a five-year old child was being abused daily by an adult male. That child abuser (subsequently identified as their father) was also causing the young female child to participate in scripted inappropriate sexually related activities with one or more adults on Skype. Further, that person was producing images of the sexual assaults and sexual misconduct and then distributing them on the internet's internet. The crimes depicted on the internet included oral sex, penile penetration of the child's vagina and penetrating her anally with vibrators, as well as other items. Through the suspect's disclosures, the girls' father was quickly identified and arrested.

Authorities descended upon the household where the suspect lived, but was then out of the home when they arrived. Pia, her older sisters and their mother were home and swept into an investigation that signaled the next chapter in their lives as individuals and as a family. Their mother was stunned to be confronted with the allegations that prompted the raid and had no idea that her husband had been sexually abusing their daughters.

Her oldest sister, Ava, recalls that day. "When dad got taken away, I was in my pajamas. They took me away and left me in a room alone, I sat in a white room with cameras. They questioned me and I was so confused and so scared. They grabbed me from my mom. I also have wondered how mom did not know. It was traumatic. Everyone told me, 'You are abused.' They wanted me to spill this. I was in denial. Dad was not aggressive. He said we were going to play a game and made it appealing for us."

Initially none of the four children did make any disclosures and denied any inappropriate activity. Also, as a first line defense, their father refused to discuss the offenses. Subsequent forensic analysis of his devices identified four other victims in addition to Ava, Mya and Pia. Though two of the other non-relative victims did not disclose, the evidence was overwhelming and authorities quickly filed multiple charges covering the following alleged crimes:
- Sexual assault that included Pia and one other,
- Invitation to sexual touching that included Pia and two non-siblings,
- Sexual exploitation perpetrated on Pia (2 counts),
- Possession, distribution and production of Child Pornography (3 separate counts).

Though temporarily released, he was forbidden any contact with minors, including his own children. He stayed with the pastor of the church with which he had been in recent years only nominally affiliated.

Taken into custody after forensic analysis of his computer files was begun, he was confronted with the copious evidence and entered a partial confession shortly thereafter. Within two more weeks, further charges were filed that included his three daughters Pia, Mya and Ava, as well as two of the neighbor children who had previously been identified.

Within two months, he had entered guilty pleas on 11 of the 16 charges. Three months later, he was sentenced to a total of 13.5 years with additional 29 years prohibition from areas where children congregate and from any computer communication with those under 16 years old.

His seven victims at the time of his arrest ranged between five and ten years of age. At the time of his conviction, there were hundreds of images known to be circulating on the internet.

As is the practice of national and international agencies established to address child exploitation in

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 7

a coordinated manner, sets of images are classified according to a distinguishing feature within the image. In the case of the images produced and distributed by the father of the children, the series was named "Sweet Sugar series," with each child victim in the series being given a further adjective to distinguish one from the others.

Ultimately, the investigation found that Ava was 7-8 years of age when the first images were made of her. Mya was 6-7 years of age and Pia was 4-5 years old. Confiscated images and other information finally disclosed indicate that the abuse spanned a period of from 12 – 18 months duration. It was understood that the abuse and production of images would have continued indefinitely, but for his identification and arrest. At the time of the discovery the only one of his children who was not sexually abused was their son; he was nine years old when their father was arrested.

The images (including videos) found in their father/perpetrator's collection involved, conservatively, the following criminal activities:
1. Images of their father/perpetrator causing his older daughters to pose naked in provocative positions, expose their genitals individually or expose their genitals to their younger sister, Pia;
2. Images of sexual abuse interactions of their father/perpetrator with Pia, including his use of items such as a vibrator and pens that he caused Pia to insert vaginally and/or anally;
3. Images depicting their father/perpetrator performing cunnilingus on Pia;
4. Videos depicting Pia being made to perform fellatio on him, and
5. Their father/perpetrator anally raping Pia.

Over time, later images that their father/perpetrator had taken and distributed on the internet have been confiscated. Some include a depiction of a female child lying naked on a bed while the perpetrator licked her genitals and scripting the young child to say "asshole" and vagina."

Further, over time the children have independently shared further "bits and pieces." For example, Pia shared she remembers being made to Skype with someone who was in a basement. She also has reported "meeting his friends" on the computer. Her brother later shared there were times when he was perplexed that their father's door to his room was locked, so he could not gain access as he usually had been able to do.

Further information shared with therapists by the authorities indicated he groomed the children by ploys of playing games of dress up and role-playing for hours, such as acting like they were movie stars. He employed his power and influence to rationalize and normalize his daughters to create images that he then transmitted onto the internet.

Some of the image content revealed proof that he caused them to insert fruit in their body parts, pose in "sweet, innocent-appearing" little girl dresses, pose in lingerie. Other video content revealed that he urinated in the child's (Pia's) mouth, inserted objects in her vagina or rectum, in addition to anally and vaginally raping Pia. He used other images and videos of children being sexually victimized to normalize and model the kinds of actions he intended to perform on his victim(s). The abuse and recording of the abuse for distribution took place behind locked doors of his or the children's bedroom.

Therapists noted authorities shared that the videos indicated that Pia was manipulated to engage in sexually explicit behavior and sexualized language that, but for the introduction of such language or behavior by an older individual, would be completely atypical for a child anywhere near her age. For example, therapists noted that Pia used language such as "deep throat."

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 8

Approximately ten years later, according to NCMEC in its summary of activity with Ava's image classifications as of January 2020 the following types of sexual activities involving Pia have been identified thus far:

- a. Erotica fully clothed
- b. Erotica;
- c. Full nudity;
- d. Exposure of breast
- e. Exposure of genitals or anus;
- f. Urination by Pia;
- g. Defecation;
- h. Manual stimulation by Pia on her offender;
- i. Ejaculation by the offender;
- j. Oral copulation by the Pia on the offender;
- k. Vaginal penetration by the offender and
- l. Anal penetration.

In that same January report, from June 4, 2010 through December 31, 2018, Pia's series have been included in 8,117 submissions by 1,252 law enforcement agencies to NCMEC, seized from 1,170 offenders. These files accumulatively contained a total of nearly 27,000 files from the series involving Ava, labeled the Sweet Purple Sugar Series 246,711 files " from the Sweet White Sugar series. NCMEC also received 1,020 Cyber Tipline reports involving images of hers. In 2018 there were 55,581 series files submitted to NCMEC, an increase from 37,574 series files submitted in 2017. The second highest number of submissions below 2018 was in 2014 when 48,470 series files were submitted.

**Developments set in motion by discovery of their victimization**
The revelation of his crimes against the female children had an immediate and enormous impact on all, beginning with the shock, disbelief and guilt experienced by the children's mother. She recalls within a short period of time trying to come to grips with what she was being told. Still stunned and in shock, she went to the police and asked for some proof. They provided her with a large stack of printed material. Within the first few pages, she said she needed no more confirmation. Looking back, she said that, while she knew she needed to have the unfathomable accusations confirmed, she also has not been able to forget what she was shown – saying, "It makes me sick."

Thus convinced, their mother and all the children felt an urgency to relocate to a new residence as quickly as possible. She understood that the associations with their previous residence were instantly and irrevocably tainted – however, it also was a further disruption in all their lives. They rapidly moved out of their home and into public housing in a less desirable neighborhood, experienced a massive drop in income and had to commence counseling and related appointments.

The family was hit by other disruptive losses. In a March 19, 2010 therapy note, their mother said everyone is reeling from the tidal wave of shock and disruption. Authorities had "invaded" the house and took the children to interview rooms at the police station. For better but also worse, their father was instantly removed from their presence and none of them have had an opportunity for closure of any type with him since the day he was arrested. Though the abuser of his daughters, all of them had established a bond with him during their foundational years, and their brother had never been an abuse victim of their father.

The mother of the children said that she has been informed that her now-ex-husband's images had begun to appear approximately 12 – 18 months prior to the revelation of his crimes. Working

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 9

backwards, she says this means that Pia was approximately 3-4 years old; Mya was approximately 6-7 years old and Ava was approximately 8-9 years old.

Further, their mother reports she had to quit work. Since her husband and the children's abuser had been the primary wage earner, she and the children were thrust into a financial crisis. She was off work for two years; "I had no choice." She said she had to be available to support the members of the devastated and overwhelmed family that was reeling from the exposure of the secrets, the public aspects of his arrest, removal from the home, his prosecution and rumors that were spread by at least one mother of another alleged victim.

For the first two years following the arrest and exploding crisis in her family, she sought and received public assistance so that she could meet her primary responsibilities as the children's remaining parent. She said she knew it fell to her to help each of the children survive to the best of her or his ability. She reports that she did return to employment within a couple years of his arrest.

Their mother said these developments led to another layer of pain for the family within their community of acquaintances.  Specifically, Mya's best friend's mother quickly went "public" within their group of friends and the local school community. This problem did not really subside, according to the mother of the children. As recently as about three years ago, the same woman was triggered again by her daughter's spending time with Mya. This experience from the outset has chiefly had a traumatic effect on Mya as well as her sisters and mother. It served to "confirm" the devastating impact that can occur when others come to know about the abuse or the images.

Another repercussion in the family environment has been the downward spiral of her brother who was a casualty of a different type. He had been nearly eleven years old when their father's crimes against his sisters had been discovered and his father had been arrested. Years later he disclosed that he had begun smoking cannabis shortly after the family was blown apart. He subsequently has become reliant upon mood altering with drugs to cope with his own unprocessed grief and losses. (He presently struggles with severe drug dependence, homelessness and joblessness.)

## Mental health treatment history: 2010-2017
Prior to the discovery of the sexual abuse, Pia had appeared to be thriving and the family dynamics appeared to be working well, according to her mother. As far as her mother was aware, she discerned no need for therapy; it had never occurred to her that there was a need for it.

However, the discovery of the abuse and images changed all that. In the immediate wake of the discovery of the images and her children's victimization, their mother says that it seemed there was a "non-stop" stream of social workers that became an extended part of the family.

Pia and each of her siblings were placed in therapy. They were at different ages and had different types of abuse exposure. Each had experienced a close relationship with their father, though their inappropriate contact and abuse varied with regard to age of abuse onset and dose exposure for each of the three daughters. Consequently, their needs and readiness for counseling varied, as well.

Their brother was never directly abused, but was exposed to some inappropriate manipulation and confusing situations; he had 30 sessions. Available images and disclosures suggest that Pia, the youngest, experienced the earliest onset of and the most extensive victimization. Through early 2013 she had 45 sessions.  Her sister Mya had 50 sessions and Ava had 59 sessions during that same time frame. The sessions mainly focused on age appropriate trauma-informed therapy.

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 10

Because of the differences in ages and experiences, and also because of the mix of personal survival strategies and attitudes to therapy, the family has never received any family therapy.

Pia, herself, has been in one form of therapy or another during significant periods since the revelations of her abuse resulting from the discovery of her images on the internet. Still, she has severe mental health issues.

Initially Pia met with another therapist from March 2010 to March 2012 encompassing a total of 54 sessions. Early observations noted her avoidant behavior and "happy child presentation." Over time the therapists attempted to piece together what the scope and impact of the history was for each of the children.

Pia's initial therapist reported she was unable to comprehend her losses, given that she was only five years old at the time. Early in therapy she was described as being in her own world. She did share, "Mom said dad did bad things." She indicated she was aware he "did stuff" to others. She said to the therapist that she just wanted "… to erase it and start the slate over."

The discovery that the children's images had been distributed online compounded the issues to be addressed, particularly given their ages. It led to significant restrictions being placed on the children's access and exposure to the internet, access to phone apps and freedom to participate in sleep overs.

### Educational history from 2010 to July 2019
Pia's sexual abuse pre-dates her entry into her kindergarten year. Pia attended the local elementary school that her older siblings attended. She attended kindergarten during school year 2009 – 2010, the same year during which the abuse was discovered.

Her teacher's comments in the fall prior to the discovery of her abuse noted that Pia appeared to be a happy student who appeared to enjoy school, seemed happy and confident. Her mother recalls her having been "a social butterfly." Pia was enrolled into a foreign-language immersion elementary school.

Mid-way through her kindergarten year, massive disruptions occurred following the discovery of the abuse. Even so, she still generally met expectations academically. She was described as "cheerful and cooperative," and a child who demonstrated a positive attitude towards school. Comments indicated, however, that improvement was needed with her listening skills, ability to work independently and use of time.

By the first semester of third grade, Pia generally was rated with good work habits, with the exception of following through on homework and listening skills. Her attitude was described as usually responsible and cooperative with adults, and someone who did very well with her peers. At the end of her third grade year, Pia was described as struggling with reading, English and foreign language art, but met criterion in Math.

Pia was described as "kind and friendly," energetic and eager mid-way through fourth grade year. She was described as getting along well with others. That same year she was referred for speech-language services, because she tested below grade level with fluency. Questions were raised about language difficulties that were contributing to her academic challenges.

In grade five, progress reports indicated that she was meeting academic expectations in most subjects. She was described as an energetic and charismatic student at the time, but sometimes

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 11

struggled with small groups.  Testing in grade six indicated that, for the most part, Pia was in the lower end of the average range in language fundamentals. On the Expressive One-Word Picture Vocabulary Test Pia performed in the average range.

In more recent years Pia has struggled much more with concentration problems, severe sleep difficulties, anxiety, depression, social isolation and self-esteem problems. This has resulted in significant challenges with school, adding to a downward spiral in her school motivation and participation.

These problems developed to the magnitude that in spring 2019 her depressed mood and high anxiety resulted in her dropping out of school. After a conference she and her family attended at the national child protection center in early 2019, she plummeted in her mood to the point that her mother relented to Pia's pressures to allow her to withdraw for the balance of the year. Reflecting on those moments, her mother said, "Pia had a breakdown in the school counselor's office related to this stuff." Her mother said she shared with the school counselor "'bullet points' about what Pia has been dealing with."

When Pia was informed that her mother had spoken to the school counselor who knew all three girls, she was "upset." Pia agrees she became furious that her mother had revealed something about which she felt so embarrassed, adding to her reasons why she spiraled further downward and pressed to leave school. She has been critical of her school performance and grades in school, reasoning, "I sort of stopped school and decreased the number of days I was going. If I am not good at all, why go?"

She did leave school, so when she no longer had to return to school spring term or the summer, the stress she felt at school was temporarily removed. The decision about how to proceed fall 2019 still loomed before her as of the July 2019 interview.

Pia is presently in the tenth grade. She has described a lack of motivation for her subjects and has difficulty with studying subjects that don't seem relevant to her. She is not engaged and lacks all interest in her school.

On the positive side, Pia says she has had a longstanding interest in art expression and is an art enthusiast. She has created a portfolio of her work.

**Medical history**
In 2010 Pia had a fracture of her left elbow. Aside from that, her health record is without reference to major illness, head injury, loss of consciousness, high fevers or chronic medical conditions.

**Developments after Pia's discovery of the existence of images**
Pia does not recall when she first knew about the existence of images. She does recall talking to a man on Skype that had been arranged by her father, though that did not equate in her mind with the distribution of images. The realization of the impact of the ongoing activity on the internet has taken her longer to process and has not been anything she has wanted to face, given the complicated implications that flow from that part of her reality.

**Pia's trajectory: January 2010 – July 2019**
But for the existence of the images and the ongoing activity on the internet, her mother says that she believes the effects of the sexual abuse on Pia would have been substantially mitigated. Instead, her mother added, "This is a lifelong thing. This keeps the abuse alive. He would have been serving his sentence and it would have been to a large extent finished. But "no," you have

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 12

thousands of people uploading and doing the crime over and over again. Those people are equally responsible for continuing to abuse them.

"You could not believe what I have been dealing with Pia in the past couple of months. Do you know what it is like on a daily basis?  She comments that she would be better off dead. She is in a downward spiral. I don't believe she would commit suicide; she says she doesn't have a game plan.

"Her pain is so great. The crime and the images – the whole thing is connected. Pia says her whole life is completely destroyed. In all respects, it is destroyed – and she is right. She says she is angry with God.

"She has basically shunned everyone. Pia has completely cut herself off from friends. But when she did quit school, her friends called her sisters and asked where she was. If I can't get Pia back to school, I will need to get a tutor." Her mother said the recent acquisition of a companion dog seemed to help her connect and receive love and attention. Her mother also granted her request to have a Guinea pig in her room for the same reason.

Pia enjoys sewing. She also loves to express herself through art. She has received an award for having been the best art student in her school. Ultimately, Pia hopes to pursue a career in animation, or even artistic cake decorating.

She says she would like to attend an outstanding art program several hundred miles away that she and her mother believe would be excellent for her. However, it presently is cost prohibitive at $15,000 - $20,000 per year. She has also stated that she is too insecure to attend the school on her own, and would like her mother to accompany her. They both say that is not a viable option. The combination of factors that includes the distance from home, being there by herself, and being in a place with many people who were strangers appears, for now, to be too much for her. Pia says her fear is fueled by her knowledge there are persons "out there" who have viewed her or her sisters' images. Pia has more recently expressed interest in learning to play the guitar and her family is supporting her in taking guitar lessons, which she willingly attends weekly.

With regard to her interactions with males at school, she made references to boys in her class and sex education class, appearing to be free to comment on guys' penises. Her mother says, "She seems to know a lot. She is open to speaking about body parts." Her mother says that Pia does not appear to have a filter when talking with her. She appears to speak matter-of-factly with regard to female and male body parts. Her mother describes her as having several friends who are male. But she eschews wanting anything to do with someone after he has asked her out. Her mother described her as "standoffish." Her mother says that neither Pia nor her sisters are "huggy."

**Social media involvement**
As with all her sisters, Pia displays an awareness of broad risks of exposure on social media that might lead to potential discovery by those who might be fixated on her internet images and curious about finding her. She also appears to be aware of general predatory activity on the internet that targets children and youth. She has worried about getting a YouTube account. She has expressed a fear that her name might be attached to her pictures. She is not on Facebook, but says for a while she has been using one of the other social media options to communicate with others. Pia said, "Mom posts everything for me. Even then, that makes me think someone could keep photos."

Pia says that she has "concerns" about the images, explaining, "I don't want my name on things. I am afraid that it will be linked to something. I don't want anyone to recognize me. I do know I look very different from how I looked as a little kid." She says that intellectually she thinks it a low

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 13

possibility, but also thinks it is not impossible. Further, she said she is aware that the more people to whom she is exposed, the more likely that there will be someone who has seen some of the images.

Their mother has been clear about not sending "selfies" and especially no pictures in which they are in any stage of undress. To her knowledge there has been no attempt by anyone to contact Pia or either of her sisters.

## Pia's January 2017 evaluation

Pia has had a previous evaluation to assess how she is doing. This was completed in January 2017. Pia shared then that she hoped those viewing her images would not then be able to recognize her from her images. She told the evaluator she has never shared about her abuse or the Internet images with anyone.

Testing at that time identified fearfulness of "situations or places," and a sense that "others are out to get me. She reported anxiety, nightmares, shyness, suspiciousness, sadness and schoolwork problems.

Other testing indicated significant clinical elevations involving dissociative symptoms, emotional numbing, daydreaming and avoidance. She appeared to have developed a coping style that involved a detachment from the environment as a way of avoiding "real world" demands. She also indicated sexual concerns including anxiety and compensatory avoidance of sexual issues.

The psychologist recommended a lifelong course of care based upon her assessment of Pia's issues and needs that approximated $92,000.

## Winnipeg conference of survivors of internet exploitation: 2019

Pia, Ava and their mother attended a conference in early 2019 for other survivors of internet sexual exploitation. Pia described the experience as having had both beneficial and troubling features for her.

For example, she felt encouragement from gathering with other survivors and seeing the efforts of the national agency in leading the fight to combat internet sexual exploitation and help survivors like herself. She said it was encouraging to her to know that authorities combatting the internet trade of their images had active programs and a web crawler aggressively seeking out imagery involving sexual exploitation.

Pia added, "Through the visit, I tried not to cry when I heard the stories of all the other families. There were other families who also had daughters whose images are on the Internet. It was good to know we are not the only ones in the universe. It was good to know how similar they are to us. I have empathy for them."

However, she said she also became more conscious of the nature of the activity involving their series of images. In particular, she referred to the magnitude of the image exploitation generally, the nature of the internet activity and how quickly images of childhood sexual exploitation are generated. In a very real sense, Pia described the experience as breaking through her defenses of "not thinking" about the impact of the online exploitation of their images.

Pia said, "Knowing how big [the problem] is and seeing the numbers that Arachnid finds was hard. (Arachnid is a web crawler and platform that actively seeks to remove online images of childhood sexual exploitation.) That was interesting, kind of scary, seeing how big the problem is. Definitely

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 14

coming back [home], I was thinking how big it is and that there is nothing you can really do to stop it."

### Family members' descriptions of impact of abuse on Pia: July 2019

Her mother

Her mother expressed how the knowledge of the nature and magnitude of the sexual exploitation images has been "devastating" to Pia. Her mother shared Pia and her sisters have been, and are being, faced with both types of traumas.

Pia's mother said she herself has felt out of control and "completely helpless." She shared that Mya initially thought the images could be removed permanently, saying, "But Mom, they can take them down." Her mother said she told her that wasn't possible.

Their mother said she is worried for her daughters and angry that they are continuing to be victimized. "My children and I have suffered a long time. The [police] knew the pain my family was dealing with. They set me up with Victim Notification Services. They really cared."

"Years ago, I was invited to speak at a trial in Ohio. As scary as it was, it was also an amazing experience. I purposely looked at [the man convicted of possessing her daughters' images] and looked him in the eye. I want to do more than that."

Her mother described what she has witnessed regarding the impact of the distribution of images on Pia. She prefaced her comments by saying that she and Pia's sisters have seen that "Pia has been injured a lot." More specifically, she, "[Pia] is still only [in her mid-teens]. She is really hurt and angry."

She said that Pia remains haunted and burdened by the thought of multiple unknown individuals presently being interested in images of her abuse and shame – whose identities and intentions are unknown.

Her mother reported that Pia has also told her that she has regretted being a girl, given the original abuse by her father and the permanent existence of the images being traded of her sexual victimization. Pia has told her mother that she thinks her life would be better off if she were a boy. She has expressed the thought of cutting her breasts off. (In this evaluation, she shared, "I don't like myself as a female, because all this would not have happened.") Her mother is confident that Pia believes if she had been a boy, the abuse and the distribution of her images never would have happened.

(In this evaluation, Pia acknowledged that she has thought about gender reassignment, though she said she doesn't know if she ever would do that. She adds, "I think if I had not been a female, it would not have happened. If I was a male, I feel I might be a bit happier. Even now, these are thoughts I have."

Pia's antipathy to her own gender is exacerbated by painful menstrual cycles. Her mother said she has raised what her mother interprets as "some trial balloons" about possible gender reassignment, thinking that her menses-related challenges would be eliminated. Her mother says her general response has been to listen, but not probe or interrogate her, pacing herself with what Pia chooses to share.)

Her mother says that Pia does exhibit a pattern of wanting to change her appearance. Accordingly, she has wanted to color her hair and wears a style that is designed to cover part of her face,

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 15

including one of her eyes. Pia has wanted to cut her hair short, and her mother said she has not given her permission to do so at this time. She said she doesn't want to reinforce the idea of not being herself. She added that this seems to be reflective of a conditioned response over time to hide and avoid recognition, as she is hypervigilant and fearful about being recognized.

**Sister Ava's observations regarding her sister Pia during July 2019 evaluation**
"[Pia] was never vocal. She did not speak or share anything at the 2019 survivors' conference. Only in the last two years she went crazy. She has been dark, suicidal and depressed. I have tried to ask her what is wrong. She is sad."

**Legal history**
Pia has no history of legal difficulties.

**Other trauma exposure**
Aside from experiencing the disruption of the family and the cascade of consequences after that, there appear to be no other trauma or significant loss experiences.

**Drug and alcohol history**
Pia represents she does not consume alcohol or illicit drugs. She is not prescribed any habit-forming medications.

**Pia's interview comments during July 2019 evaluation**
Pia said she feels "sad much of the time." She added, "A few months ago I was sad all the time. School was much more stressful. I went to talk to a counselor." She said that her mother's sharing with her about telling her school counselor what she was dealing with regarding the ongoing sexual victimization made it more difficult for her. She explained, "I didn't feel like I needed to know. [she had told my school counselor]."

"I don't expect things to work out for me." She said that she is anxious around "a lot of people." She also said, "I don't want people to search into me and find about my past. I don't want anyone to know. So I am pessimistic."

She is depressed. Pia says that she views her life as a successive series of failures. She is critical of herself and even blames herself for her original abuse and all that it has subsequently led to. "I feel like I should have known." She describes being indecisive, self-critical, sad, fatigued, unmotivated, sleep deprived and admits having struggled in early 2019 with suicidal thoughts. She says she often can't sleep until 4:00 AM; she said she lies in bed feeling alone and vulnerable. Then she says she is able to fall asleep when first signs of daylight appear.

When she was attending school, she dealt with nightmares, as well. She said, "I have always had nightmares." They are recurring, with content that she associates with being "scary," desolate and isolating." She says she has not had any that she specifically identifies with online exploitation.

Pia disclosed in the interview, "As a survivor of abuse, it doesn't help knowing that there is more than one of him."

Pia shared that when she thinks of the ongoing trafficking of the images on the internet, or "when it randomly pops up or some of these topics come up, I try not to cry." She said that some triggers occur when "kids are making jokes about rape or sexual exploitation. I have dark humor, but sex jokes are off limits."

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 16

Pia shared that she imagines she will feel uncomfortable when her father eventually is released from prison. She added, "I don't think the world is just or fair."

### Continuing educational history: July 2019 to February 2020
Her mother says in January 2020 that it has been another year that Pia has been missing, educationally speaking. After attending the first week back at school, her anxiety and stress increased to the point that her mother allowed her to enroll in a 'homebound' program. Her teacher has been visiting with her twice weekly at her home for instruction, although it is only possible when one of her sisters or her mother are available to be there with her. Further, Pia has expressed having high anxiety when she takes a test, wanting a family member to be there with her. While Pia has expressed wanting to graduate with her contemporaries, she will be unlikely to do so unless she is able to return to school. Fear, anxiety and depression continue to have their combined, debilitating effect on her.

In mid-February 2020 her mother did indicate that Pia has been accepted into an in-district special needs program for students with emotional challenges. Preliminary reports are that Pia is initially favorable to the program, but that 'experiment' is in the very early stages and it is unclear how she will do in the longer term.. Her mother is hopeful. She knows that Pia is still hoping to graduate with her class, and that may provide the necessary motivation for her to push through her avoidance while continuing therapy and her medication regimen.

### Continued mental health involvement: 2017 - 2020
Pia is the only one of the girls who has *not* taken a break from therapy over the years since her abuse was discovered. The initial treatment was addressed earlier in this evaluation. She saw a therapist in 2017 and continued to see her until early 2019. Her mother says the logistics of scheduling and transportation were difficult for her. She participates in art therapy on a consistent basis. Her mother affirms she had a good bond with her therapist, although their work ended when her therapist had to relocate and she struggled with feelings of abandonment.

Her mother, though wary, said she has finally consented to Pia's starting on psychotropic medication. She had to overcome her concerns about medication for Pia, but Pia's desperate pleading for help, including medication, was the tipping point for her mother. She has been taking paroxetine (Paxil) 20 mgs. She has only been taking the medication a short while with no obvious effect thus far; the medication was recently doubled.

Pia's new therapist stated during telephone interview in mid-February 2020 that she has only had two sessions with Pia. She indicated there was a great deal she did not yet know about Pia's history, current problems and treatment needs. She said establishing a rapport with Pia seems difficult and she is still not sure about how well the connection will work, though she hopes it does. She has expressed the recognition that transportation logistics are an obstacle for Pia and her mother, as Pia has expressed fear of riding the bus by herself.

Echoing the observations of her mother, she has seen Pia enough to recommend more intensive therapy that even weekly sessions could not match in terms of concentrated, supportive therapy. To that end, she has referred Pia to an intensive adolescent outpatient treatment program. She currently is on a waiting list for that.

### Interval history July 25, 2019 – mid-February 2020 (according to her mother)
Her mother reports that Pia has continued to do very poorly. She had not attended school from September 2019 through January 2020. She has continued in her pattern of isolation and downward depressive spiral that was documented last summer up to the present time.

Her mother and older sisters are quite worried about Pia. Pia continues to be "angry, hopeless and scared." She sometimes sleeps in the bathroom, because she feels more fearful and the door can be locked. Her mother said she had to put a double lock on Pia's bedroom door to help her feel safer in her own room. Pia is fearful of being out alone walking her dog, as she exhibits a pervasive fearfulness that permeates how she relates to all aspects of her highly restrictive world. Pia has been fearful of being in public by herself and refuses to ride the bus on her own, limiting her growth towards autonomy and hindering her individuation.

Her mother said that Pia has continued periodically to tell her that she wants to "chop [her] boobs off." She tells her mother she thinks, "Guys treat women as objects," a perception reinforced by the activity of those continuing to download her images on the internet.

She continues to show no indication of alcohol or drug use. Pia's problems with attending school continue to be particularly severe. She continues to stay home and not attend class.

Pia has been given a dog and guinea pig that her mother had hoped would make a difference, though it doesn't appear to have provided as much benefit for Pia she had hoped. However, she has demonstrated an interest in music lessons/therapy and has responded very well to that. It has been a bright spot in her otherwise bleak journey, to date.

Her mother has been responsive to her interest in music, as well as art, and supported Pia's interest in taking guitar lessons on a weekly basis.  This has been the one exception to her traveling to her lessons on her own.

Her mother has noticed that Pia has intense difficulty when she knows her mother has shared with a counselor or a medical provider about the abuse history and the internet image exploitation. It threatens to disrupt Pia's willingness to work with that person. Most recently, she said Pia "fell apart" when she heard her mother describe to a naturopath what Pia had been through.

Her mother perceives Pia has a good relationship with Ava, but thinks that is not the case with Mya at this time. In fact, their mother gave permission for the two older girls to take Pia to California for a special weekend. She expressed the belief that it was a good bonding for the girls and beneficial for them.

Pia struggles with chronic sleep problems. She describes it as "terrible;" her sleep cycle has been significantly altered; she stays up late and then sleeps until approximately 1:00 PM. Given Pia's depression, despondency, suicidal ideation and socially isolating patterns, her mother said 2019 has been emotionally exhausting.

### Current home situation
Their mother has a male partner now who has lived with her and with the family in recent years. They are planning on getting married. Their mother says that he is a "wonderful, caring man" who is a good male role model. She believes this is important for her and the girls, given their prior experiences with their birth father.

### PSYCHOLOGICAL TESTING AND QUESTIONNAIRES:
Pia was administered psychological tests, questionnaires and DSM-5 – related symptom lists in order to increase the database upon which conclusions in this evaluation were made. (*NOTE: The interpretations of the psychological tests presented below are hypotheses and should not be used in isolation from other information regarding Pia. The interpretive statements are primarily*

*computer-generated, actuarial and expert predictions based on the test patterns. Interpretations reflect characteristics of persons who have provided test response patterns similar to those of Pia. Test results are probabilistic in nature and should be interpreted cautiously. The reader should examine the test interpretations for general trends and put limited weight on any one specific statement. In the integration and presentation of the test data, where results were unclear or in conflict, I have selected the most likely hypotheses for presentation here.)*

Initially, using a 4-point Likert scale for each of the criteria for Attention-Deficit/Hyperactivity Disorder (ADHD). I reviewed with Pia the degree to which she had symptoms consistent with ADHD as a possible explanation for her concentration challenges. Neither her responses (nor history) are consistent with a diagnosis of ADHD, although she does struggle with concentration difficulties. The other tests (see below) confirm similar findings. Since PTSD, anxiety and depression also can contribute to concentration and focus symptoms, and there does not appear to be a strong history of concerns for ADHD, these other disorders more likely than not account for her concentration challenges.

Pia also completed the Beck Depression Inventory – II (BDI-II), an assessment of depressive symptoms. This is a widely used 21- item inventory with a continuum of scores of 1-4 reflecting greater severity. Pia provided two responses on some items indicating some overlapping symptom severity. Hence, depending on whether the lower numerical rating is counted or the higher numerical rating is counted, her scores could be calculated to be 26 or 33. The "26" score is consistent with someone who is responding in a manner consistent with *moderate depression*, whereas the higher score of "33" is consistent with more *severe depression*.

Pia completed the *PHQ-9*, a screening measure for depression. Her self-reported score of 14 places her in the range of *moderate depression*. Nearly every day she said she struggles with sleep problems and "bad" feelings towards herself. More than half the days she says she feels "down, depressed or hopeless" and has thoughts she would be better off dead.

Pia completed the *Generalized Anxiety Disorder 7-item (GAD-7) Scale*. Her responses on this brief screening measure are consistent with *moderate anxiety*. She indicated over half the days she was feeling anxious, could not stop worrying, worried too much about different things and feared something awful might happen.

Pia completed the Millon Adolescent Clinical Inventory (MACI). This is a psychological assessment that provides information on the personality traits and psychopathology including primary psychiatric disorders identified in the <u>DSM-5</u>. Designed for adolescents, the MACI helps identify indicators of possible psychiatric disorders in adolescents. It also helps assess personality patterns, self-reported concerns and clinical symptoms.

Pia identified "lack of confidence" and "body/looks" as the two most troubling areas for her at the time. There was no indication of significant test-taking biases that might distort the findings. In that regard, the test is considered a valid representation of the current state of her psychological functioning. However, her scores were modified to account for the dejection reflected in her responses on the Depressive Affect Scale and self-deprecating response tendencies.

Teens who respond as Pia did tend to mute or dampen feelings as a primary way of dealing with anxiety and mistrust of others. She thinks poorly of her abilities. Such persons tend to be shy and withdrawn from others. She has a very poor image of herself. She projects that she is unattractive, unappealing and worthless. To deal with these thoughts and feelings, she inclines towards social withdrawal and isolation. Such persons become sub-assertive, depressive, shy and inward-focused.

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 19

Persons who respond such as Pia tend to feel as if everyday demands of life are more than she can bear.

Persons with this type of profile experience considerable worries about adequacy at school and poor social relationships. She projects others will view her as negatively as she views herself, contributing to an increasingly isolative experience.

The indications are that Pia is a troubled youth who struggles with having hope about her future. Her profile is consistent with someone who feels "blue," downhearted, unworthy and unattractive, consistent with a persistent depressive syndrome. Struggling with anxiety, dysphoria and self-doubts, Pia's response pattern is consistent with someone who is at risk to struggle periodic thoughts of suicide. Persons who respond as did she also have difficulty experiencing joy and pleasure, reporting sleep difficulties and poor appetite. Such youth usually long to belong and find acceptance, though she appears to be losing hope that will ever happen for her.

A review of critical items on the MACI reflects her acute distress, emotional isolation and thoughts of committing suicide at some point. Her responses are also consistent with those who have suffered childhood sexual abuse.

Indications are that psychotropic medications should be considered for Pia in addition to her continuation of psychotherapy. She likely will initially resist self-exploration, though it is much needed. The more she restricts her world, the more she deprives herself of possible life-enhancing experiences, fueling an avoidant, self-defeating depressive pattern. Avoidance as a primary means of managing her anxiety is likely to only further her isolation and increase the distance for her recovery to a more engaged life. Fear, anxiety and insecurity are major themes for her to explore.

Pia and her mother also completed the Behavior Assessment Scale – Second Edition (BASC-2) with responses pertaining to Pia. This is a norm-referenced, standardized behavioral assessment system designed to facilitate the differential diagnosis and classification of a variety of emotional and behavioral disorders of children. As with the MACI or any standardized testing, it should not be used apart from other information sources when conducting an evaluation.

The BASC-2 has forms that can be completed by the examinee and a parent. In this evaluation, both completed the items on the BASC-2 with regard to Pia. Pia's responses are considered to be a valid representation of her current state of functioning, without significant exaggeration or minimization of symptoms.

One of the particular strengths of the BASC-2 is the ability to compare the examinee's self-report scores with the parent's perceptions. In this case a comparison of the tests reveals that there is a significant discrepancy between her mother's and Pia's perceptions of her functioning.

Her mother's responses do raise the possibility that her test taking orientation has over-subscribed to problematic symptoms. Careful review of her responses and other narrative information, however, suggests that she more likely is objectively capturing a current representation of Pia's current state of functioning.

Specifically, her mother responded to the items in a manner that indicates she views Pia displaying symptoms consistent with significant clinical levels of depression, internalizing patterns, social isolation and withdrawal, somaticizing (conversion of psychological symptoms into complaints about physical concerns/symptoms) and clinical levels of anxiety. Her mother's global perception of how Pia is doing is consistent with Pia's experiencing severe clinical symptoms and difficulties. Her

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 20

mother's ratings of Pia effectively indicated that Pia's problems with internalizing and overall behavioral symptoms place her at the upper 99th percentile of severity in her age range. Her mother does not see hyperactivity, aggression or conduct as problems, all of which tend to be externalizing behaviors.

Her mother does view her as only mildly adaptable in daily life functioning. The total average rating for adaptability is consistent with Pia's functioning at the lower 13th percentile of her peers. Her lowest rating was in leadership, where her mother's observations placed Pia in the lower fourth percentile. This is consistent with the many indications in this evaluation of social withdrawal and isolation.

In contrast, Pia responded in a manner that does not place her in any of the severe or clinical levels of the BASC-2 test. Pia's ratings of herself on the composite scales are generally more benign and less concerning than her mother's ratings of her – although her history appears to be more closely aligned with that of her mother's responses. Pia does not acknowledge the level of difficulties that her mother sees, although at the time she was sequestered at home, did not want to return to school, and had been struggling with moderate to severe depression in the preceding months.

Consistent with the review of ADHD symptoms (see above), neither view her as having symptoms that rise to the level of supporting a diagnosis of ADHD. While she does have concentration difficulties, likely they are secondary to her depression and anxiety. Even considering the different perceptions of mother and Pia, her overall emotional index score fell within the concerning range. She does describe herself in a manner consistent with very poor self-esteem.

Pia's own self-report responses do place her at the 87th percentile on the Emotional Symptoms Index, a measure of moderate "at-risk" concerns for Pia. The ESI is a global indicator of moderate, but not severe, emotional distress for the examinee.

These findings support the conclusion that her mother, who has raised three older children and has a broader perspective on normative ranges of functioning than does Pia, views Pia as struggling much more than does Pia. This is consistent with the other narrative and historical information, suggesting that Pia is struggling and is likely in a psychological situation in which she is unable to recognize the depth of the psychosocial and academic challenges with which she is dealing.

Pia was also asked to complete the *PTSD Checklist for DSM-5 with Criterion A*. This instrument itemizes all the symptoms that are related to a DSM-5 diagnosis of PTSD. The examinee is asked to rate the severity from "0" to "4" on each of the items.

This examiner asked her to respond to the twenty items related to two conditions. The first was regarding her original sexual victimization by her birthfather; the second was her response to the knowledge of the downloading and/or trading of her images online. With regard to her father's victimization, she rated the symptoms at 47; the suggested cut-off for diagnosing PTSD is 33.

On the second condition, her symptoms as related to the activity of the downloaders and/or possessors of her images, she responded in a manner consistent with a total score of 27. The prominent scores pertaining to those involved with her images were the following: 1.) Extreme avoidance of anything reminding her of the existence of the images, and 2.) Strong negative feelings regarding the activity and its implications, resulting in fear, anger, guilt and/or shame.

She indicated that "quite a bit-3," the existence of the images on the internet and the activity associated with the images contributed to her being hypervigilant, on guard or watchful. They also

contributed "quite a bit-3" to her difficulties falling or staying asleep.

Finally, I used the questionnaire entitled "*Psychological Evaluation Questionnaire Addendum*" to review her thoughts about the internet sexual exploitation involving images of her childhood sexual abuse. She shared that her father, her abuser and the producer of the images, had groomed her for his abuse by sharing with her some of his own child sexual exploitation images—presumably to normalize the behavior and demonstrate certain types of illicit activity for her to replicate for him.

She indicated she did not recall how she first discovered the existence of the images. She shared that she cannot assume that every person is bad based upon the images being viewed by some, although it has the effect of casting a bad light in her mind on those using her exploitation images since she does not know them.

Pia shared that the knowledge of the activity involving her and her sisters' images makes it more difficult to be out in public. She says she worries that "stuff could happen." Her knowledge of the activity involving her images also continues to fuel her anger towards her father and to those who are involved with her images. Her feelings are strong enough that she feels as if she would want to kill her father if she could. The effects of her original abuse, complicated by the distribution of images taken and now being distributed, have influenced her attitude towards having children. She said she doesn't want similar things to happen to a child she might bring into this world. A couple of years ago she said that if she did have children someday, she worried about how and she would tell them the story. "When would they be mature enough not to tell [others]?"

## SUMMARY AND OPINIONS
### Summary

The clinical interviews, psychological testing, collateral interviews, and review of records support the following summary with regard to Pia, in my professional opinion, stated to a reasonable degree of psychological probability.

Pia was born into an intact family, the youngest of four children. Free of prenatal, birth or neonatal difficulties, her early childhood development was without difficulty. Part of a busy family with working parents and four active young children, they appeared to be an average working couple with active children.

Unbeknownst to their mother, for approximately 16-24 months, the father of this "normal-appearing family" was involved with an international child sexual exploitation group, using his children as objects to be exploited as currency for his involvement. His sexual abuse of his three female children, and reported inclusion of their son in occasional nude showers and wrestling matches is reflected in reports of the children and/or in images of their exploitation.

The birthfather's sexual abuse of his children was interwoven with skyping and the production of images to be disseminated to persons similarly interested or fixated on child exploitation images. The acts perpetrated on the children were egregious. To date, the majority of images confiscated by legal authorities worldwide involve Pia, and sometimes her sisters. They, too, were also abused and exploited, as well, according to images in existence and their self-reports. Even so, the abrupt severing of ties with their father was itself confusing, painful and devoid of a facilitated grieving process for each of the children.

Then five-year-old Pia, as one of the remnants of the shattered and demoralized family, suffered additional repercussions in abruptly leaving her home and neighborhood to head to a neighborhood where they lived in public housing. Further, the family experienced a drastic decrease in resources

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 22

that led to removal from any after-school activities that cost money. She and her fellow family members were exposed to numerous, well-motivated strangers entering the world from law enforcement, children's protective services agencies and mental health providers. The time requirements for attempting to cover the bases for the immediate demands also led to their mother having to quit work to be there for her children.

Unlike some sexual abuse victims whose internet exploitation remains unrecognized for a time, the images in what is now designated the Sweet Sugar series were actually the means through which the father and co-criminals were identified. However, that was not the emphasis in therapy or parental input, as those issues were initially beyond the developmental capacity for then five-year-old Pia to comprehend.

As she and her siblings grew older, their mother and therapists cautioned about unintentional exposure through detection through social media. Still, in her and even her older sisters' minds, this seemed relatively abstract and remote as a concept for Pia until recent years. Their mother sought to normalize the children's lives and not fuel paranoia related to other potential online predators, while trying to strike a balance with instilling caution in them with the possibility of genuine risks.

It appears that for Pia and her sisters, the reality of images being "out there" and viewed by others like their father only began dawning upon them in the past two years. This also paralleled the timeframe when her older sister began approaching adulthood with pending decisions to be made about how she would cope with the notifications of those being prosecuted for her images. Their mother reports witnessing the anguish as her oldest daughter's epiphany that their images would never be completely removed from the internet and would always be susceptible to being traded and viewed by others like their father.

Pia, herself, is unable to recall when it began to "sink in" for her about the implications of the Internet dissemination of her images, although she says it has become increasingly clear to her in 2019. In fact, the clarity of the nature of the activity on the internet and the magnitude of internet exploitation (as well as encouraging efforts to combat it), likely reached its high point in her early 2019 trip to the national center combating childhood sexual exploitation and image trafficking.

Pia shared that the visit was both positive and negative. The visit with her mother and sister Ava included hearing the stories of others in similar situations, and hearing about programs such as Arachnid. Hearing that the program "crawled" through the internet and removed many images of child exploitation was positive for her. However, she also came to understand technology could not remove all extant images and began to get a sense of the amount of activity on the internet.

Pia has participated in extensive therapy, but currently struggles with substantial ongoing psychological issues. She has struggled in school, predominately affected by lack of motivation, concentration difficulties, depression and anxiety.

Her depression has caused her to spiral downward and lose interest in continuing on, to the point that she has contemplated options of suicide and gender reassignment so she will no longer have to face the burdens that living as a female poses for her. As her mother has observed, "the crime and the images – the whole thing is connected. Pia says her whole life is completely destroyed." She has isolated herself socially. She is angry with God.

Responding to cautions over the years, she has been careful about her internet presence and has made accommodations to reduce being identified or becoming a target of those searching for her.

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 23

She and her mother both identify substantial former and ongoing effects of the original sexual abuse and the continued activity involving her images. Both have described her symptoms, thinking patterns and behavior in terms consistent with PTSD, anxiety, depression and gender dysphoria.

Psychological testing ruled out ADHD as an explanation for her problems with concentration and focus. Other test results are consistent with moderate to severe depression, and again reflect that she has dealt with suicidal ideation. They also are consistent with moderate anxiety levels.

**DIAGNOSES**

| | |
|---|---|
| F43.23 | Posttraumatic Stress Disorder |
| F40.00 | Generalized Anxiety Disorder |
| F32.2 | Major Depressive Disorder, Severe |
| F45.8 | Other Specified Somatic Symptom and Related Disorder, intermittent stress-related headaches |
| F64.9 | Unspecified Gender Dysphoria |
| Z62.810 | Personal history of sexual abuse in childhood |
| Z62.811 | Personal history of psychological abuse in childhood (by perpetrator) |
| Z55.9 | Educational Problem |
| Z65.4 | Victim of crime: original sexual abuse and exploitation and ongoing online sexual exploitation |

**Opinions**

In my professional opinion, the interviews with Pia, collateral interviews with her mother and sisters, psychological testing, and a review of available records forms the basis for the following conclusions regarding the referral questions, stated to a degree of reasonable psychological probability. The following opinions and recommendations are provided, based on available information and, should additional information become available, are subject to revision.

1. Pia has been psychologically injured by the aggregate effects of her original sexual victimization, the knowledge those images of her and her sisters' exploitation will remain on the internet in perpetuity and the knowledge that persons like her father (as far as she knows) are viewing and trading those images on the dark web.

2. These injuries are substantial, severe and permanent in their impact on her. They are reasonably likely to continue to remain so for the indefinite future, based upon the ongoing activity of the images and the nature of the internet.

3. It is impossible to differentiate with precision the effects of the original abuse and the impact of the replication (in her mind) of her father by unknown identities and intentions of multiple other persons engaged in criminal sexual exploitation of her images. The associations are completely intertwined, each actually potentiating the effects of the other. The original abuse and betrayal, all of which occurred before she was 5-1/2 years of age, will continue to be re-stimulated by notifications of the ongoing internet sexual exploitation, aggravated by her uncertainty of the intentions of those involved with her images.

4. The activities on the internet mean to her there will never be closure for her (and other survivors of such activity) of the abuse that set all this in motion. The knowledge of the images being actively traded is a reminder to Pia of the original abuse and the continued existence of harmful persons who view children as objects to be exploited. (Note: The findings involving Pia are consistent with the general impact on other survivors of similar dual victimizations.)

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 24

5. Although she knows of the existence of the images, she generally remains shielded for now by her mother/guardian, but she will face having to manage the notifications and implications of the activity involving images as an adult. The recent conference with other similar survivors was informative for her about how these issues are likely to continue to impact her.

6. The trauma footprint that Pia brings to this forensic evaluation is characterized by the presence of the following sequelae for Pia, the images of her sexual exploitation having been significant proximal or aggravating factors:
   a. Academic participation and learning has been adversely effected;
   b. Anger at the generic group of men who possess and trade images of her as a child being sexually exploited without regard to its collective impact on her;
   c. Anxiety, both generalized and social, that contributes to difficulties with her being comfortable around others, enhancing a dependency upon her home environment and refuge from exposure to the outside world;
   d. Avoidant behavior as a means of anxiety reduction that adversely effects her ability to function in the real world;
   e. Concentration problems that adversely impact her ability to function in school;
   f. Depression that is chronic and moderate - severe, including intermittent suicidal ideation and thoughts she would be better off being dead;
   g. Gender dysphoria: Pia has psychologically found herself resolving her traumatic introduction to sexuality as a 4-5 year old and as an ongoing sexual exploitation victim by thoughts consistent with gender dysphoria. Her own trajectory of sexual identification was affected at an early age, compounded by the emergent knowledge that images are "out there" and being traded. This has significantly contaminated her psychosexual development, consistent with some but not all indications associated with gender dysphoria.
   h. Guilt: Pia still struggles with the notion that somehow she might in some way have been culpable for participating in the activities orchestrated by her father – though she was only 4-5 years of age at the time. In her mind, it has occurred to her that if that had not happened, there would have been no images on the internet. The awareness and reminders of the existence and dissemination of activity involving her images has the effect of keeping that shame extant.
   i. Hypervigilance for anyone who might recognize her, know about the existence of her images and/or pose a threat to her;
   j. Negative cognitions about herself, her vulnerability, the threat posed to her by the outside world, her negative feelings about being a female and the belief that if she were a male she would not have had to contend with these troubles;
   k. Nightmares – intermittent;
   l. Shame about the memorialization into images and videos of her sexual exploitation by her father, and the dissemination of those images onto the internet where they continue to be viewed by others for erotic purposes (though she has barely begun to even process this cognitively or emotionally);
   m. Underlying fear of being recognized because of her images and/or fear of being harmed by unknown persons who are fixated on her images; and

7. Pia is in need of further indefinite mental health services (see next session).

## Recommendations

Based upon my summary and conclusions stated above, I recommend that Pia continue in therapy.

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 25

I have reviewed the recommendations previously provided by the forensic psychologist in early 2017. Based on her evaluation, she recommended one hundred sessions over the next two years after her evaluation at a cost of $20,000. Subsequent to that, she recommended ten sessions annually for the next twenty years. She factored into her estimates the projected costs for transportation and vocational assessment and counseling.

Three years later, Pia appears to have psychologically deteriorated compared to her status at the time of her previous evaluation. Further, it must be emphasized that there likely will be continued activity involving her images over an indeterminate amount of time. This will present her with major psychological demands and perpetuate and exacerbate all of her psychological issues as she moves closer to adulthood and becomes the one contacted by victim notification services.

The findings resulting from this evaluation reveal that Pia has significant psychological impairment, necessitating a modification in the projected costs for mental health intervention; the range of estimates are provided below, based upon $200/session:

1. Individual psychotherapy and/or EMDR sessions:
   a. January 2020 – December 2022 (three years): Twice weekly sessions calculated at 300/year for two years: 300 sessions @ $200/session = **$60,000**.
      i. (There may be an intensive outpatient adolescent day treatment program that would reduce her weekly sessions for the duration of the program. As a publicly funded program, the cost would not be borne by Pia's family.)
   b. January 2020 – December 2022 (three years music lessons) 150 sessions @ $50/session (150) = **$7,500.00**
   c. January 2023 – December 2032: weekly sessions (500) calculated at 50/year: **$100,000**.
   d. January 2033 – December 2042 monthly sessions (120) calculated at 12/year: **$24,000**.
   e. Further lifetime sessions January 2043 or anytime, related to intermittent crises that are image-related, such as aggravation of symptoms triggered by attempted contacts from persons with her images, relationship problems related to the online activity, circumstances related to parenting of children, etc.: 50-100 sessions: **$10,000 - $20,000**

2. Psychotropic medication management sessions (frequency varies based on need):
   a. Medication management sessions, as needed) for ten years: Range **$6,000 - $18,000**.
   b.

3. Transportation @ $15/hour assuming 1.0-hour round-trip (three years): 300 hours: **$4,500**.

4. Intermittent lifetime survivors' conferences and networking expenses for recovery purposes: 5 – 10 meetings - based upon $3,000 estimated costs per conference: estimated range **$15,000 - $30,000**

5. Vocational assessment and guidance: **$25,000** (using the previous evaluation estimates)

6. Educational assessment (in view of her substantial educational challenges): **$10,000**

**Total projected lifetime costs: $262,000 - $299,000.**

RANDALL L. GREEN, Ph.D.
"Pia" – Sweet White Series (Corrected Copy)
Page 26


Please do not hesitate to contact me in the event that you have questions or clarification about the contents, conclusions, and recommendations contained herein. My conclusions are based upon the body of information available to me as of the completion of this report. I reserve the right to revise any portions of this forensic evaluation in the event that additional materials are provided that might affect the conclusions that I have reached.


Respectfully submitted,


Randall L. Green, Ph.D.
Clinical Psychologist

VICTIM IMPACT STATEMENT

BY PIA'S MOTHER

"SWEET SUGAR" VICTIM

Regarding my daughter:

How has this crime affected my child's general well being? A crime of this magnitude
has had an enormous emotional effect on my child. My child's life has been changed
forever.  She is very aware of the images and videos that were produced and
distributed online. She is aware of the seriousness and vastness of this crime. This
crime creates a crippling insecurity in her and makes her worried and extremely
upset. The fear consumes her daily. Talking about this crime (the distribution of her
abuse images) causes her to feel sick almost to the point of vomiting. When her
siblings start to talk about anything related to this crime, she will ask us, her family,
to stop talking about it and will go on to say how she feels ill. She will shut down and
not want to talk about it. At times my child is full of anxiety, and does not know how
to express it. Sometimes she tries to just bury it. But, she is not able to keep it
buried, and it re-emerges in unexpected and unpredictable ways—often anger, but
also sadness. I believe that she worries that others will learn what has happened to
her, and that she will be shunned, ridiculed or victimized  by others who don't know
how to react to the reality that my daughter has to cope with. She is embarrassed
and humiliated, knowing that images that portray her in a sexual manner are
available for others to see.  She is afraid, as am I,  that she will be recognized by
those who have downloaded the images of her abuse. At times, she appears to be
depressed. At those times she is withdrawn, uncommunicative, sleepy, sometimes
tearful, occasionally paralyzed and unable to move forward or complete tasks that
she is quite capable of completing, appearing to be unmotivated, unable to
concentrate, and overwhelmed. It is as if this child has a huge burden that she has to
carry, and all of her energy goes into carrying that burden, so she has less energy for
everything else in life. She doesn't want to be defined as a victim, but she cannot
escape her victimization, and she can never put it in the past, because it is ongoing.
My child, the victim, understands that I, her parent, will do whatever is necessary to
keep her safe and be her voice in the ongoing criminal proceedings. I do not know
how to help her come to terms with what she continues to experience. I worry that
it may never be possible for her to "recover" from the ongoing abuse. I fear that she
may not be able to grow beyond it because she is forever that little girl, caught in
those images that are repeatedly viewed by the defendant and his ilk.

What physical injuries or symptoms has my child suffered as a result of this crime?
My child has prolonged major trauma that will mess with her mind for the rest of
her life. She is concerned for her appearance, and, at times, has asked to alter her
features to change her appearance. Around the time when our family was notified of
the crime of the circulation of her images, she wanted her hair style to cover her

eyes. She was so little and scared, that it was a possibility that other predators might notice her from pictures and videos that surfaced online so she tried to hide herself! At times my child is full of anxiety, and does not know how to express it. Sometimes she tries to just bury it. But, she is not able to keep it buried, and it re-emerges in unexpected and unpredictable ways—often anger, but also sadness. I believe that she worries that others will learn what has happened to her, and that she will be shunned, ridiculed or victimized by others who don't know how to react to the reality that my daughter has to cope with. She is embarrassed and humiliated, knowing that images that portray her in a sexual manner are available for others to see. She is afraid, as am I, that she will be recognized by those who have downloaded the images of her abuse. At times, she appears to be depressed. At those times she is withdrawn, uncommunicative, sleepy, sometimes tearful, occasionally paralyzed and unable to move forward or complete tasks that she is quite capable of completing, appearing to be unmotivated, unable to concentrate, and overwhelmed. It is as if this child has a huge burden that she has to carry, and all of her energy goes into carrying that burden, so she has less energy for everything else in life. She doesn't want to be defined as a victim, but she cannot escape her victimization, and she can never put it in the past, because it is ongoing.

How has this crime affected the way my child relates to his or her friends, either at school or in my neighborhood? Has the crime affected my child's school work in any way? I'd like to give you an example of how this crime has affected her in relation to social situations at home and school. At home, she is often afraid to go outside and play unless one of her family members is watching and keeping an eye on her. Mostly she has resorted to staying inside where she feels safe. She used to be such a carefree, outgoing little girl, not afraid of anything. The circulation of her abuse images has fueled a type of ingrown fear causing her to be withdrawn, often causing her to not want to engage in public events. Most recently, there was talk about a school project that the teacher had requested the students converse with an adult (a Community Political Party Leader) online, for the sole purpose of asking questions related to politics. My child was in no way comfortable communicating online with an adult, especially a stranger. She is afraid of the internet, and what she knows is out there.

My joy of parenting has been paralyzed. When I became a mom, never did I once think that my child would become a victim of sexual exploitation. Abused and molested over and over again through online child pornography. Sexual predators watching my little girl being coerced into performing degrading acts of cruel and violent abuse. My child's body being violated incessantly. She is my baby. Her well-being and my job to protect her is my concern. How is she protected from individuals such as this person? Individuals that willingly upload, possess and share videos of her? My older children are appalled to learn that these videos are in circulation. One of my children said to me, "But Mom, they can be removed forever, right?" How do I reply to a question like that? This particular individual somehow gained possession of the videos we speak of. How can I insure they will be removed forever?

I worry about my daughter's safety and wonder if she is recognized by other pedophiles when we are out in public. My trust in other people is forever tarnished. Neither I nor my child know: who has seen her images? What do people assume or believe about her, based upon what has been circulated on the internet? She does not want to be defined by her abuse, but she cannot escape it either. When we go to a public place, like a mall, a theater, a sporting event, I wonder: who here has seen my child's abuse? Like my child, I am suspicious of everyone, and I no longer believe in the goodness of other people. I fear that strangers may come after my child, seeking to perpetuate or re-enact the abuse they've witnessed, perhaps even trying to kidnap her. My child and I are defensive and fearful in ways that other children don't have to be—because their privacy isn't invaded on a regular basis by strangers, like the defendant.

Do you have any idea how this has affected us? Counseling is ongoing, but it can only help us cope with the reality—it cannot un-do the harm. Financially we have struggled greatly. My mental and emotional health has been affected due to the crime and has impacted my ability to work full time. Emotionally we have all had to manage depression brought on by the knowledge of the ongoing crimes.

As the parent, I try to be strong, but feel very weak. I am overcome with grief; I feel dead. I myself have been diagnosed with Post-Traumatic Stress Disorder. I have had to delicately handle my older children's emotional turmoil that they have experienced due to their knowledge of these crimes.

I look at my beautiful little girl and am heartbroken. I wish I could put a stop to this crime. Today I am her advocate. I am her voice. She is the victim of a horrible crime, that no one ever, especially a child, should ever have to go through. When she becomes an adult she will be retold the stone cold truth, about what is fully online and how she has been silently abused all these years. I know she will be livid but beyond that, what other life-long health issues will she encounter? It pains me to even imagine.

This defendant has damaged, demeaned and de-valued my child.  He or she may tell the court they are sorry, but there is no actual accountability to my daughter for the ways that the defendant has harmed her .

To the defendant:

You make me angry. I stand here broken-hearted for my child. As the parent, I am devastated. How will this crime affect her future? My own mind can't even comprehend why an individual would seek to possess, distribute and watch images of my child being abused. I want to protect her and keep her safe. My well being is at stake. Insecurity runs rampant through all of us. It is a daily struggle to maintain strength. The uncertainty of who is watching or viewing my exploited child is killing me!

Your actions more than disgust me! How can you prey on helpless, innocent little kids? How could you deceive everyone? It's because of people like you that our trust

in others has been compromised. My kids attend school. Are they safe to do so? How many other people like you are there out there?

I want to keep my child in a bubble to ensure that she is safe from people like you. Unfortunately, her abuse is on the internet. How can I reassure her that those images and videos are no longer being circulated online?

Her little body is supposed to be her most valuable possession, and not intended to be available for unlimited exposure. She becomes powerless through your actions. I want to know how many times you indulged in watching my child be abused. How many other people did you share the abuse with? I want to make it clear to you that my child is not a sexual object or your toy! This child is my pride and joy. I love her more than anything in the world. Being a mom is all I have ever dreamed of. What I didn't ever dream of is her life being crushed by this horrendous crime.

I have prepared this statement to speak on her behalf. I am determined to be her advocate. I strive to be the best Mom that I can be. I sacrifice my needs for the sake of my child's needs. Unfortunately, it's apparent that you and people like you selfishly pursue your own self-interest with no regard for the harm inflicted upon my child. You make me sick. Have you any remorse? Because my child has to live the rest of her life knowing that she was and is still being looked at and watched by people like you.

No court order can restore what you have taken from her—and what she is exposed to by the continuing circulation of her images to others, with no regard for her, as a child, as a person. I want you to understand the damage you have done to my daughter. I want you to understand the tremendous costs she bears and I bear for the damage you have done by invading my daughter's privacy and circulating her images.

I swear and affirm that the above statement is true and accurate.

Dated this _27th_ day of March, 2019.

# Addendum to Victim Impact Statement

ADDENDUM TO VICTIM IMPACT STATEMENT

I'm in disbelief that I am actually having to explain the on-going suffering of my daughter(s) in point form. Each criminal found guilty of contributing to the exploitation of my girls should be handed a sentence that includes restitution for them.  The restitution is justice for my daughters.

I have four children that each have different needs at different times.  In the last few months I've been trying to keep Pia's head above the water. This little girl is in a downward spiral. She is at an age that she wants larger answers and yet it is not in her best interest for her own health and wellness to be exposed to the gross details of her abuse.  It would be even more detrimental to her development.  It pains me to have to explain myself and the situation she is having to deal with.  I myself have to remove my protective layer and feel completely violated and vulnerable (just like my girls must feel each and every time they need to be evaluated) just to prove that my children deserve restitution.

I've been dealing with a little girl who talks daily about not wanting to exist anymore. A little girl whose pain is so great and who feels so hopeless and angry that she talks openly about wanting to kill herself.  She has become more depressed and anxious as she is maturing and growing, and as she understands to a greater depth the ongoing crimes committed against her.  She will not socialize with peers outside of school.  School attendance is irregular and I am working with the school counsellor.  My daughter had a breakdown at school just last week when she was speaking to her school counsellor. She is easily overwhelmed by her emotions. Her counsellor was very worried and concerned about her talk about suicide.  Pia will be seeing a new counsellor, soon. It's not a problem that will ever be solved but it is the only option out there to teach her how to manage the continuous pain experienced  from the existing ongoing abuse she must endure.

DATED THIS 30 DAY OF JUNE, 2019.

# Broadus & Associates

112 N. Harvard Ave. #221, Claremont, CA 91711
(909) 621-6316    Fax (909) 575-4525
Paul@BroadusAndAssociates.com

September 23, 2021

Deborah A Bianco, P.S.                                    Re: Pia (Pseudonym)
P.O. Box 6503
Bellevue, WA 98008

## Employability Analysis

### Purpose and Scope of Evaluation

This case was referred on June 3, 2021 by Deborah A. Bianco, P.S. with a request to evaluate Pia's employability and future earning capacity in light of her status as a child pornography victim/survivor.  Pia is a pseudonym utilized instead of her real name in order to maintain anonymity.

This analysis is based on information obtained from a review of the available records, a Zoom meeting with Pia and her mother on July 22, 2021, and subsequent research regarding employment options.  All conclusions are based on the facts as set forth in these documents. Should any contradictory information become available at a later date, further analysis may be appropriate to determine whether or not they would warrant a change in the findings.

### Victim / Survivor Information

Re                  : Pia (Pseudonym)
DOB                 : Redacted
Age at Abuse        : 3-5 years
Current Age         : Teenager
Primary Language    : English
Current Occupation  : Student

Preliminary Employability Analysis for Pia

**NOTE REGARDING PRESERVATION OF VICTIM/SURVIVOR PRIVACY**

*The nature of internet exploitation of images of child sexual abuse has led to a new standard of practice to identify victims/survivors of this type of crime by a pseudonym chosen by the survivor or, in the case of a minor, the legal guardian. Additionally any identifying place names and other traceable personal information that might lead to the identification of the victim/survivor have been sanitized or redacted to maximize the continued anonymity of the victim/survivor for her or his protection.*

*This need for protecting victim/survivor anonymity with internet-based crimes of sexual exploitation is based on information provided by the National Center of Missing and Exploited Children (NCMEC), The Canadian Centre for Child Protection, national law enforcement agencies and international law enforcement agencies. Evidence is clear that there continues to be ongoing criminal activity involving images of children's sexual exploitation that can include any particular survivor's images. Pia and the others in the series known as Sweet Sugar are no exception.*

*Further, there exists with this type of criminal activity a known risk that those involved in any capacity with such exploitation images may be actively seeking personal information, identification and/or location of victims/survivors. In some cases, persons have attempted to make contact with victims upon whose images they may be fixated. Hence, the imperative need to make all possible efforts to protect the identity of persons who still may be known targets of further criminal efforts.*

**Records Reviewed**

<u>Randall L. Green, Ph.D., 2/26/2020 Forensic Psychological Examination</u>

- Diagnoses
    - F43.23 Posttraumatic Stress Disorder
    - F40.00 Generalized Anxiety Disorder
    - F32.2 Major Depressive Disorder, Severe
    - F45.8 Other Specified Somatic Symptom and Related Disorder, intermittent stress-related headaches
    - F64.9 Unspecified Gender Dysphoria
    - Z62.810  Personal history of sexual abuse in childhood
    - Z62.811  Personal history of psychological abuse in childhood (by perpetrator)
    - Z55.9 Educational Problem
    - Z65.4 Victim of crime: original sexual abuse and exploitation and ongoing online sexual exploitation
- Pia has been psychologically injured by the aggregate effects of her original sexual victimization, the knowledge those images of her and her sisters' exploitation will remain on the internet in perpetuity and the knowledge that persons like her abuser (as far as she knows) are viewing and trading those images on the dark web.

- These injuries are substantial, severe and permanent in their impact on her. They are reasonably likely to continue to remain so for the indefinite future, based upon the ongoing activity of the images and the nature of the internet.
- It is impossible to differentiate with precision the effects of the original abuse and the impact of the replication (in her mind) of her abuser by unknown identities and intentions of multiple other persons engaged in criminal sexual exploitation of her images. The associations are completely intertwined, each actually potentiating the effects of the other. The original abuse and betrayal, all of which occurred before she school age, will continue to be re-stimulated by notifications of the ongoing internet sexual exploitation, aggravated by her uncertainty of the intentions of those involved with her images.
- The activities on the internet mean to her there will never be closure for her (and other survivors of such activity) of the abuse that set all this in motion. The knowledge of the images being actively traded is a reminder to Pia of the original abuse and the continued existence of harmful persons who view children as objects to be exploited. (Note: The findings involving Pia are consistent with the general impact on other survivors of similar dual victimizations.)
- Although she knows of the existence of the images, she generally remains shielded for now by her mother/guardian, but she will face having to manage the notifications and implications of the activity involving images as an adult. The conference with other similar survivors was informative for her about how these issues are likely to continue to impact her.
- The trauma footprint that Pia brings to this forensic evaluation is characterized by the presence of the following sequelae for Pia, the images of her sexual exploitation having been significant proximal or aggravating factors:
  - Academic participation and learning has been adversely effected;
  - Anger at the generic group of men who possess and trade images of her as a child being sexually exploited without regard to its collective impact on her;
  - Anxiety, both generalized and social, that contributes to difficulties with her being comfortable around others, enhancing a dependency upon her home environment and refuge from exposure to the outside world;
  - Avoidant behavior as a means of anxiety reduction that adversely effects (sic) her ability to function in the real world;
  - Concentration problems that adversely impact her ability to function in school;
  - Depression that is chronic and moderate - severe, including intermittent suicidal ideation and thoughts she would be better off being dead;
  - Gender dysphoria: Pia has psychologically found herself resolving her traumatic introduction to sexuality as a preschooler and as an ongoing sexual exploitation victim by thoughts consistent with gender dysphoria. Her own trajectory of sexual identification was affected at an early age, compounded by the emergent knowledge that images are "out there" and being traded. This has significantly contaminated her psychosexual development, consistent with some but not all indications associated with gender dysphoria.
  - Guilt: Pia still struggles with the notion that somehow she might in some way have been culpable or participating in the activities orchestrated by her abuser - though she was only 3-5 years of age at the time. In her mind, it has occurred to her that if that had not happened, there would have been no images on the

internet. The awareness and reminders of the existence and dissemination of activity involving her images has the effect of keeping that shame extant.
  o Hypervigilance for anyone who might recognize her, know about the existence of her images and/or pose a threat to her;
  o Negative cognitions about herself, her vulnerability, the threat posed to her by the outside world, her negative feelings about being a female and the belief that if she were a male she would not have had to contend with these troubles;
  o Nightmares- intermittent;
  o Shame about the memorialization into images and videos of her sexual exploitation by her abuser, and the dissemination of those images onto the internet where they continue to be viewed by others for erotic purposes (though she has barely begun to even process this cognitively or emotionally).
  o Underlying fear of being recognized because of her images and/or fear of being harmed  by unknown persons who are fixated on her images; and
  o Pia is in need of further indefinite mental health services.

• Three years later, Pia appears to have psychologically deteriorated compared to her status at the time of her previous evaluation. Further, it must be emphasized that there likely will be continued activity involving her images over an indeterminate amount of time. This will present her with major psychological demands and perpetuate and exacerbate all of her psychological issues as she moves closer to adulthood and becomes the one contacted by victim notification services.

• The findings resulting from this evaluation reveal that Pia has significant psychological impairment, necessitating a modification in the projected costs for mental health intervention;
  o Individual psychotherapy and/or EMDR sessions
  o Psychotropic medication management sessions (frequency varies based on need):
  o Transportation
  o Intermittent lifetime survivors' conferences and networking expenses for recovery purposes:
  o Vocational assessment and guidance: $25.000 (using the previous evaluation estimates)
  o Educational assessment (in view of her substantial educational challenges):

## Background

Pia was the victim of sexual abuse by her abuser at a very young age of 3-5 years. The sentencing order of the abuser also indicates that he produced and distributed onto the internet a total of 482 images and 88 videos containing images of Pia and her siblings. Pia is now in her teens and struggling to complete high school.

**Education, Work Experience and Transferable Skills**

Pia's sexual abuse pre-dates her entry into her kindergarten year. She was enrolled in a foreign-language immersion elementary school and the abuse was discovered that same year.  Thus, she has dealt with the sequalae of her exploitation over the entire course of her elementary, middle and high school years.

Educational records show that early on, improvement was needed with her listening skills, ability to work independently and use of time. She had trouble following through on homework and with listening skills. She began struggling with reading, English and foreign language.  She was referred for speech-language service because she tested below grade level with fluency. Questions were raised about language difficulties that were contributing to her academic challenges. Testing indicated that for the most part, Pia was in the lower end of the average range in language fundamentals.

As noted by Dr. Green, "In more recent years Pia has struggled much more with concentration problems, severe sleep difficulties, anxiety, depression, social isolation and self-esteem problems. This has resulted in significant challenges with school, adding to a downward spiral in her school motivation and participation. These problems developed to the magnitude that in spring 2019 her depressed mood and high anxiety resulted in her dropping out of school. After a conference she and her family attended at the national child protection center in early 2019, she plummeted in her mood to the point that her mother relented to Pia's pressures to allow her to withdraw for the balance of the year."

Pia had little to no education over the following year. After attending the first week back at school, her anxiety and stress increased to the point that her mother allowed her to enroll in a 'homebound' program with twice-weekly visits from a teacher for instruction. However, this was only possible when one of her sisters or her mother were available to be there with her. Further, Pia expressed having high anxiety when she would have to take a test, wanting a family member to be there with her. Dr. Green reported that "fear, anxiety and depression continue(d) to have their combined, debilitating effect on her."

In mid-February 2020 Pia's mother enrolled her an in-district special needs program for students with emotional challenges. It has no attendance requirements or mandatory homework assignments.  She anticipates that a diploma will be awarded once it is complete, but her mother reports that this will not equate to a "regular" high school diploma.  Plans for anything after that are entirely uncertain.

Pia has never been employed or performed any work for pay.  He mother indicated that she has been trying to get her some work, but said she has too much anxiety to have even limited social interaction.

Both Pia and her mother report that she has a gift for art including drawing, sculpting and digital painting; she received an award for best art student in her school.  She also enjoys cooking and sewing. She took a multi-media art class at school and has posted art online.

Dr. Green reports that Pia struggles with chronic sleep problems, depression, despondency, suicidal ideation and socially isolating patterns. He also notes that she has struggled in school, "predominately affected by lack of motivation, concentration difficulties, depression and anxiety…. Her depression has caused her to spiral downward and lose interest in continuing on, to the point that she has contemplated options of suicide and gender reassignment so she will no longer have to face the burdens that living as a female poses for her…She has isolated herself socially."

Dr. Green notes that "psychological testing ruled out ADHD as an explanation for her problems with concentration and focus. Other test results are consistent with moderate to severe depression….and with moderate anxiety levels." Additionally, based on my review of the records there were no genetic problems, no problems of this nature with siblings, and no other developmental problems.

**Factors Affecting Employability**

Pia continues to deal with a range of challenges, as indicated by the reporting of Dr. Green, school records, and her own descriptions as well as those of her mother. Data from the U.S. Census Bureau documents reduced lifetime earnings for persons with "one or more selected symptoms: depressed or anxious; trouble concentrating; trouble coping with stress."  Based on results from the most recent Current Population Survey, persons in this category earn 50% (49.9) less over the course of a worklife than persons with no disability.  This is due to difficulty keeping a job, longer periods of unemployment, missed work while employed.

It is impossible to predict with certainty what educational level Pia would have obtained had she not been exploited and ended up with the challenges outlined above.  However, government data clearly documents the average earnings for various levels of educational attainment.[1] Based on a typical 40-year worklife (ages 25-65), projected lifetime earnings can be calculated.  In Pia's case, these would be reduced by half as documented by the Census Bureau data for persons dealing with her symptoms:

| Educational Attainment | Average Earnings on an Annualized Basis | Average Lifetime Earnings | 50% Reduction Based on Census Data |
|---|---|---|---|
| | | | |
| High School Graduate or GED | $39,669 | $1,586,760 | $793,380 |
| Some College, No Degree | $47,558 | $1,902,320 | $951,160 |
| Associate Degree or Equivalent | $48,141 | $1,925,640 | $962,820 |
| Bachelor's Degree | $70,657 | $2,826,280 | $1,413,140 |

This data shows that Pia is likely to lose anywhere from approximately $800,000 to $1.4 million over the course of her lifetime, even if she achieves the same educational level that she would have if she were not dealing with the aftermath of her abuse.

Additionally, there is the very real possibility that Pia will not reach the same level of educational attainment that she would have achieved if she had not been abused. This is evidenced by her difficulties in completing her high school education, as well as the problems she has experienced throughout her schooling leading up to high school. In that case, her potential future loss of earnings will be even greater, as calculated by comparing the earnings in the table above.

There are other considerations as well.  At this point it is not clear whether Pia will be able to successfully enter the workforce, or if she does, whether she can hold down a job on a regular basis.  There are also substantial indications that if she does find a career that is workable for her, she will be delayed in completing the necessary preparations and thus delayed in actually starting work. This is due to her ongoing difficulties with school and the issues discussed in detail above. This would result in a shorter overall worklife, and therefore reduced lifetime earnings.  While there is no reliable way to translate this into a dollar amount, it nevertheless provides further evidence that Pia faces a significant loss of future earning capacity, based on a variety of factors.


**Conclusions**

Due to the ongoing challenges resulting from Pia's exploitation, she will incur a significant loss of future earning capacity as documented above.

The opinions offered in this report are all to a reasonable certainty, and based upon my education and experience, my review of the records, and the information available. Opinions are subject to change should further documentation become available, which provides information substantively different than the facts available at this time.  I also retain the ability to review and provide rebuttal to other experts in this case, should that be appropriate.


Submitted by:

Paul Broadus, MA
Vocational Expert


Encl.:  CV and Testimony Listing

---

[1] Source: U.S. Census Bureau, Current Population Survey, 2020 Annual Social and Economic Supplement (CPS ASEC). PINC-04. Educational Attainment--People 18 Years Old and Over by Total Money Earnings in 2019, Work Experience in 2019, Age, Race, Hispanic Origin, and Sex

# CURRICULUM  VITA

**RANDALL L. GREEN, PHD**
**CLINICAL PSYCHOLOGIST**
**2250 D Street NE**
**Salem, OR  97301**
**Office:  (503) 364-6093**
**Fax:  (503) 364-5121**

*__EDUCATION__:*
> PhD, June, 1982, Clinical Psychology
> Western Conservative Baptist Seminary
> Portland, Oregon
>
> MS Degree, August, 1973, Personnel Counseling
> Miami University
> Oxford, Ohio
>
> BA Degree, June, 1970, Political Science
> Miami University
> Oxford, Ohio

*__LICENSING AND CERTIFICATION__:*
> Psychologist, License No. 0585, State of Oregon, February 1984 to present
> Psychologist, License No. PY 60270933, State of Washington, December 2012 to present

*__PROFESSIONAL EXPERIENCE__:*

August, 1986 - Present
> CLINICAL PSYCHOLOGIST, Private Practice, Salem, Oregon
>
> Conduct general clinical practice of assessment, treatment and consultation.  Perform forensic evaluations involving dangerousness determinations, amenability for treatment, personality profiles, Children's Service Division assessments, child custody recommendations, and general diagnostic assessments.  Expert witness in forensic work and consultation in criminal and civil litigation.
>
> Clientele span a wide range of ages from children to adults.  Treat diagnostic problems which include sexual deviancy, victim/trauma recovery, co-dependency, "adult child" syndromes, anxiety, depression, schizophrenia, paranoia, non-chemical addictions, eating, and personality disorders as well as disorders of childhood.  Utilize individual, marital, family and group therapy modalities.
> Practice Demographics (To present) include:
>
> 1)    total no. children/adolescents assessed and/or treated: approx. 550 cases
>        total no. hours: approx. 9000hrs.

2) total no. sex offenders assessed and/or treated:  471 cases
  total no. hours: approx. 10,560 hrs.
3) total no. forensic evaluations:  (pertaining to aid and assist, responsibility, pre-sentencing, SCF court-referred evaluations,  and defense-related evaluations): approx. 850
4) total no. child victims of trauma: sexual abuse, assessed and/or treated: approx. 182
5) total no. adults molested as children, assessed and/or treated: approx. 1105
6) total no. trauma victims:  adult rape, assessed and/or treated: approx. 90
7) total no. other trauma/harassment victims/survivors, assessed and/or treated: approx. 170
8) total no. court appearances, 4/2001 to 6/2015: 23
9) total no. custody evaluations:  28 cases
10) total no. CSD/Juvenile Ct. related evaluations: approx. 60 cases
11) total no. hours, deposition hours: approx.. 35
12) total cases retained by Cousel for the Defendant:  approx.. 7
13) total no. hrs., all mental health assessment or treatment:  approx. 61,000+

1985 – 1987 **CONSULTANT AND INSTRUCTOR**, National Institute for Correction.  Washington D.C. Coordinator:  John Moore, NIC

Provide consultation and training to the institute regarding assessment and treatment strategies for sex offenders in Federal and State correctional programs.  Participated in four training sessions at the National Academy of Corrections in Boulder, Colorado.  Authored four articles on comprehensive treatment planning, psycho-educational modules program evaluation and community based follow-up strategies.

August, 1985- **DIRECTOR**
August, 1986 Forensic Sex Offender Treatment Program
Oregon State Hospital
Salem, Oregon

Direct a comprehensive and assessment treatment program for mandated sexual offenders within a residential treatment setting.  Population consists of 40 males with a variety of disorders, including anxiety and depressive disorders, mild mental retardation, mild organic impairment, paranoid schizophrenia, impulse control, chemical abuse/ dependency, sexual dysfunction, sexual deviance and/or personality disorders.

Responsibilities include the following:

1. Selection, supervision, training and administration of a multi-disciplinary staff of 20 persons;
2. Supervision of an assessment program performing 150 evaluations per year;
3. Clinical direction of a multimodal treatment program.  Treatment includes the following:
 a) <u>Individual, marital, family and group therapy,</u>
 b) <u>Educational modules</u> focusing on assertiveness training, stress reduction and relaxation techniques, social skill development, cognitive behavioral coping strategies, communication and problem solving, criminal thinking error remediation, human sexuality and sexually addictive behavior

                              patterns, chemical abuse/dependence and relapse prevention.

         c)      <u>Behavioral therapy</u> utilizing the penile plethysmograph, covert sensitization, aversive olfactory and galvanic shock methods; and

         d)      <u>Chemotherapy</u> involving Medroxyprogesterone Acetate (Depo-Provera) and neuroleptic medications as needed.

4.      Program development;

5.      Participation in the Forensic Disposition Board and Executive Committee;

6.      Periodic training of hospital staff in "Abnormal Psychology" and DSM III;

7.      Membership in Hospital Treatment Planning/Documentation Committee;

8.      Provide consultation services to circuit court judges, district and defense attorneys, community corrections officers and mental health professionals, as needed; and

9.      Court testimony.

July, 1983 -   **CLINICAL PSYCHOLOGIST**
July, 1985    Forensic Psychiatric Program
              Oregon State Hospital
              Salem, Oregon

Provide both direct and consultative clinical psychological services to two wards, approximately 80 patients who were mentally ill offenders, within a secure treatment facility.  Population was predominantly schizophrenic, manic-depressive and/or organic, with frequent dual diagnoses of chemical abuse/dependency and/or personality disorder.

Responsibilities included staff training, psychological assessment, treatment team participation, program development and therapy group facilitation.

August, 1981-  **PSYCHOLOGICAL ASSOCIATE**
June, 1982    Forensic Psychiatric Program
              Oregon State Hospital
              Salem, Oregon

Participated in the development of a comprehensive treatment program for the mentally ill.  Under the supervision of a clinical psychologist, provided psychological services to a mentally ill offender population within a secure treatment facility.

August, 1979-  **DIRECTOR AND THERAPIST** (part-time)
August, 1986  Mid-Valley Counseling Center
              1880 Lancaster Dr. NE, #123
              Salem, Oregon

After three years of part-time solo private practice, co-founder of counseling center currently staffed by seven full or part-time Christian therapists including myself.  Serve as Co-Director of this center which provides approximately 85-95 hours per week of counseling, education services and consultative services.
Provide direct therapeutic services, 8 to 10 hours per week, to children, adults, couples or families.

Primary Therapeutic Orientation:  Cognitive-Behavioral.  Additional modalities include insight orientation and family system intervention.

*CLINICAL INTERNSHIPS*:

Sept., 1980-      **INTERN**
June, 1981        Oregon State Hospital
                  Salem, Oregon

                  Internship included rotations through Neuropsychological Services Section, Community
                  Psychiatric Program and Forensic Psychiatric Program (half-time)

Sept., 1979-      **INTERN**
August, 1980      Delaunay Mental Health Center
                  Portland, Oregon

                  Participated in individual and group counseling services (half-time)
                  Provided psychological testing in an outpatient community mental health facility.

*OTHER PROFESSIONAL EXPERIENCE*:

March, 1989       Addiction Dynamics: Unhealthy Dependencies, Part I
                        Community class offering
                        Salem, Oregon

May, 1989         Addiction Dynamics: Unhealthy Dependencies, Part II
                        Community class offering
                        Salem, Oregon

April, 1989       Childhood Fears, Anxieties and Nightmares
                        Alliance Day Care Center/Parents Education Seminar
                        Salem, Oregon

March 1977-       **PROFESSOR/INSTRUCTOR**
1979              Taught classes at Western Baptist College, Chemeketa Community College and
                  Conservative Baptist Seminary.  (Subjects included Personality Theory, Partner
                  Relationships and Sex Offender Topologies.)

                  Taught adult education classes for a variety of church groups.   (Subjects included
                  marriage enrichment, premarital preparation and parent education.)

March 1977-       **CONFERENCE/WORKSHOP SPEAKER**
Present           Led a variety of workshops/conferences for community and professional groups.
                  (Subjects included Sexual Intimacy in Marriage; Marriage Enrichment; Communication
                  and Conflict Resolution; life planning and values clarification; stress reduction and
                  relaxation; sexual offender and classification; assessment and treatment; and liability
                  issues in sex offender assessment and treatment.

August, 1972-     **OTHER WORK-RELATED EXPERIENCE**
August, 1976      Prior work experiences have included the following: "Youth Employment Counselor"
                  for the Employment Division, Youth Counselor for low-income and disadvantaged
                  teenagers, Head Resident and Program Coordinator for Oregon State University and
                  Miami University, and USAF Personnel Officer.

**_PROFESSIONAL ORGANIZATIONS_**:

American Association of Marriage and Family Therapists
Clinical member 1981-1995

American Psychological Association
Clinical member since 1983

Association for the Treatment of Sexual Abusers;
Member of the Board of Directors, 1984-1988
Clinical member: 1984-2001

Oregon Society of Professional Marriage and Family Therapists
Member of the Board of Directors, 1984-1987
Clinical member from 1984-1989

Oregon Psychological Association
Clinical member since 1982

The American Academy of Experts in Traumatic Stress
Clinical member:  1995

International Society for Traumatic Stress Studies:
Clinical member since 1995

**_CIVIC INVOLVEMENT:_**

Public Member
Oregon Board of Bar Examiners
2004 - Present

Public Member
State Professional Responsibility Board
Oregon State Bar
2015 - 2018

Member of Board of Directors
Liberty House Child Abuse Assessment Center
2006 - Present

**_CLINICAL/COUNSELING PSYCHOLOGY, PHD_**

**_EDUCATIONAL RECORD_**
Graduation:  June, 1982

Core Areas of Study

| | | |
|---|---|---|
| 1. | Statistical Methods | 4 hours |
| 2. | Research Design | 7 hours |
| 3. | Learning Theory | 3 hours |
| 4. | Physiological Psychology | 6 hours |
| 5. | History and Systems of Psychology | 9 hours |

| | | |
|---|---|---|
| 6. | Developmental Psychology | 9 hours |
| 7. | Personality Theory | 6 hours |
| 8. | Abnormal Psychology | 10 hours |
| 9. | Social Psychology | 6 hours |
| 10. | Others | 6 hours |
| 11. | Individual Differences | 3 hours |
| 12. | Psychological Tests & Measurements | 10 hours |

### *COURT TESTIMONY AND DEPOSITION - January 1998 through Present*

**Testimony**

Matthew Allison, individually and Tim Nay, as the Personal Representative for the Estate
of Sara E. Allison, Plaintiffs, v. Smoot Enterprises, Inc., dba Smoot Brothers
Transportation, James Decou, Peter Barnes, Horizon Transport, Inc. and Jonathan
Hogaboom, Defendants.
U.S. District Court, District of Oregon, Pendleton Division:
Case No. 2:17-cv-01598-SU;
May 1, 2019

Jonathan Rockwood and Marisa Rockwood, individually, and as guardian *ad litem* for Taylor
Rockwood, a minor child, Plaintiffs, v. Lake Oswego School District, an Oregon municipal
corporation; Jennifer Schiele, an individual
Clackamas County Circuit Court Case No. 18CV00582,
March 20, 2019

Tiffany Eggleton vs. Jefferson County, Multnomah County and the City of Portland, Multnomah
County, Oregon
Case No. 15CV28231
October 15, 2016

Daniel B. Williams v. Invenergy LLC, an Illinois Corporation and Willow Creek Energy, LLC, a
Delaware Corporation
US District Court for the District of Oregon, Pendleton Division
Case No. 2.13-cv-01391-AC
June 23, 2015    4.75 hours testimony

N.E./E.S. et al v. State of Oregon
Multnomah Cty Case No. 14CV05451
December 8, 2014

Doe v. Diocese of Yakima, et al.
Case Jurisdiction:  United States District Court for the Eastern District of Washington
Case No. CV-11-3073-EFS
March 18-19, 2014

A.M v. Craig Steven Ley and Pacific Intercultural Exchange, U.S.A., Inc.
Circuit Court of the State of Oregon for Multnomah, Case No. 1102-02024
September 27, 2012

Casey Deckard v. Diana Bunch and Jeffrey N. King as Personal Representative of the
Estate of Roland King, Case No. 102298, Circuit Court of the State of Oregon for
Lincoln County
May 11, 2012

U.S. v. Sr.A Kyle R. Dietz, USAF, AETC 56; Luke AFB, AZ
Contact:  Julie A. Beyer, Capt., USAF, Trial Counsel
February 2, 2012

U.S. v. Chadwick Keith Brannon, Case No. 4:09-CR-038-WEJ-RLV,
U.S. District Court, Northern District of Georgia
March 30, 2011

B.D., by and through his guardian ad litem, Douglas Fellows, an individual, Plaintiff v. State of
Oregon, by and through its Department of Human Services, et. al. Defendants
Case No 0912-16976 in the Circuit Court of the State of Oregon for the County of Multnomah
October 12, 2011

U.S. v. C.R., Case No. CR-09-0155, Eastern District of New York
October 8, 2010

U.S. v. Heady, USMC, MCAS Cherry Point, NC
Contact:  Kevin Shows, Major, USMC, Joint Law Center, Cherry Point, NC
October 29, 2010

U.S. v. Laursen, Case No. 08-00263-01-CR-W-HFS, Western District of Missouri
September 17, 2010

U.S. v. Faxon, Case No. 09-14030-CR-DLG/FJL, U.S. District Court, Southern District
of Florida
January 19, 2010

U.S. v. McDaniel, Case No. 4:08-CR-026-01-HLM, U.S. District Court for the Northern
District of Georgia, Rome Division
December 22, 2009

U.S. v. Jason David Bingham, Case No. 09-CR-10422
U.S. District court, Southern District of Florida
December 30, 2009

U.S. v. Howard Fluitt, Case No. 09-14014-CR-DLG and 09-14037-CR-DLG,
U.S. District Court of Southern Florida
November 30, 2009

U.S. v. Phillip M. Jacobs, Corporal, U.S. Marine Corps, Navy and Marine Corps Trial Judiciary,
Western Pacific Judicial Circuit
October 16, 2009

A.G. v. Robert Guitron; Aerobic and Dancewear Shoppe LLC, dba Lake Oswego Academy of Dance,  Case No. 0609-09578, Multnomah County Circuit Court
October 10, 2007

Joan Thomas v. William L. Newton, M.D.                    Complaint for Medical Malpractice
Case No. 0406-06635
Multnomah County Circuit Court
January 18, 2006

Kristofer Leake v. Distribution, Inc., etc.
Case No. 02C-21348
Marion County Circuit Court
March 16, 2005

C.Y. v. Church of God in Christ, Inc., et. al.
Case No. 0404-04052
Multnomah County Circuit Court
June 7, 2005

T.R. v. The Boy Scouts of America, et. al.
Case No. 020605750
Multnomah County Circuit Court
April 2004

Jane Doe v. Oregon Conference of Seventh-Day Adventists, Defendant
Case No. 00C11876
Marion County Circuit Court
October 2002

Jane Doe II v. Oregon Conference of Seventh-Day Adventists, Defendant
Case No.  00C11875
Marion County Circuit Court
October 2002

Ah Young Shin, Plaintiff, v. Sunriver Preparatory School, Inc., Defendant
Case No. 99CV0417MA
Circuit Court of the State of Oregon for the County of Deschutes
April 2001

**Deposition**

Plaintiffs D'Shay Simpson, A Minor by Guardian *ad Litem* Eric Fong*,* and Charnell Simpson, an Individual; vs. Defendants Delilah Rene, F/K/A Delilah R. Kenton and Paul Warner, Individuals and as Part of the Marital Community Comprised thereof
Kitsap County Case 15-2-01256-0
March 22, 2018 – 4.75 hours (Video Conference Deposition)

R.N., individually, J.W., individually, AND S.C., individually, Plaintiff, vs. Kiwanis, a non-profit corporation; Kiwanis Vocational Home, a non-profit entity; Lewis County Youth Enterprises, Inc. d/b/a Kiwanis Vocational Homes for Youth, a non-profit corporation; Kiwanis of Tumwater, a non-profit corporation; Kiwanis of Pe Ell, Lewis County, Washington, a non-profit corporation;

State of Washington, Department of Social and Health Services, Department of Children, Youth and Family Services, Kiwanis of Chehalis, a non-profit corporation, Defendants.
United States District Court, Western, District of Washington at Tacoma
Case No. 3:16-CV – 05059-BHS
July 12, 2017  - 3.5 hours (Video Conference Deposition)

Aland Al Zandi, a minor; Jihan Kichani and Mohammed Al Zandi, and the marital community comprised thereof, and as parents and guardians of Aland Al Zandi v. Emma Grabinski, M.D., individually and for the marital community with John Doe Grabinski, Kennewick Public Hospital District, a Public Hospital District operating as a Local Governmental Entity in the State of Washington and Does 1 through 50, inclusive Defendants
Benton County Superior Court
Case No:  15-2-02238-2
Complaint for Damages for Medical Negligence

K.H. as guardian for minor daughter, D.H.; K.H. and G.H., individually v Olympia School Dist.
Superior Court of the State of Washington for Thurston County
Case No. 14-2-01243-5
October 13, 2015 – 2.0 hours (Telephonic Deposition)

Fisher v. Clover Park School District, Defendant
Case No. 13-2-15884-7
In the Superior Court of the State of Washington for Pierce County
May 6, 2015 – 4.75 hours (Video Conference Deposition)

J.H. Plaintiff, v. Corporation of the Catholic Archbishop of Seattle, a sole corporation Defendant.
Case No. 12 2 03259 5
In the Superior Curt of the State of Washington for Whatcom County
March 9, 2015 – 3.0 hours     (Deposition)
March 31, 2015 – 2.0 hours (Telephonic Deposition)
April 16, 2015 – 5.25 hours (Perpetuation Deposition)

A.K.M. and J.E.M. v. The Alaska Club, Inc. and Shnon Hero Choi
Case No. 3AN-07-6978 CI
In the Superior Court for the State of Alaska, Third Judicial District at Anchorage
April 27, 2009 – 3.5 hrs.

T.T.D.S., S.S., G.L., & C.M., Plaintiffs v.
The Salvation Army aka the Salvation Army, Northwest Division, A California Nonprofit Corporation and Robert Lee DeHaan, individually, Defendants
Case No. 07-2-03505-2 KNT
Superior Court of the State of Washington for King County
Deposition: 6/19/08 and 6/20/08 - 11 hrs total

Robert Curtis, Plaintiff, v.
North Lincoln Hospital Health District dba North Lincoln Hospital, and MRI Imaging Services II,
Defendants
Case No. 941288
In the Circuit Court of the State of Oregon for the County of Lincoln
Deposition: 5/14/99